FURLEV SALES AND ASSOCIATES, INC., Respondent,

v.

NORTH AMERICAN AUTOMOTIVE WAREHOUSE, INC., Defendant.

Martin M. Fiterman, Appellant.

C. Richard Brisbois, Appellant.

Nos. 81–1025, 81–1050.

Supreme Court of Minnesota.

Oct. 15, 1982.
Rehearing Denied Nov. 19, 1982.

Dygert & Dygert, Robert W. Dygert and Gregory Collins, Hagerty, Candell, Lindberg, Milota & Butler, Charles J. Lindberg and David J. Butler, Minneapolis, for Brisbois.

Samuel D. Finkelstein, Golden Valley, for Fiterman.

Lindquist & Vennum, Edward M. Glennon, J. Michael Dady and Susan G. Loitz, Minneapolis, for Furlev Sales and Ass'n, Inc.

KELLEY, Justice.

Appellants Martin M. Fiterman and C. Richard Brisbois appeal from a judgment holding them jointly and severally liable to pay respondent Furlev Sales and Associates, Inc. (Furlev) $125,000 in compensatory damages for wrongfully interfering with an employment contract Furlev had with North American Automotive Warehouse, Inc. (North American), and appellant Fiterman appeals from a judgment against him awarding Furlev $75,000 in punitive damages. Both appellants likewise appeal from denial of their motions for judgment notwithstanding the verdict or for a new trial. We are called upon to determine whether an officer and principal shareholder of a corporation is immune from personal liability for alleged wrongful interference with the contractual relationship between the corporation he heads and a third party; whether the evidence was sufficient to sustain findings awarding compensatory and punitive damages for wrongful interference with a contractual relationship between the corporation and the third party when a party was acting in various capacities as attorney for the corporate officer or for the corporation, and also for himself as a possible purchaser of the corporation; whether various evidentiary and other trial rulings made by the trial court were erroneous;

and, finally, whether the damages awarded were sustained by the evidence. We hold that a corporate officer is immune from tort liability when acting for the corporation and, accordingly, we reverse the judgment against appellant Brisbois. We affirm the judgment against appellant Fiterman.

North American was in the business of selling fast-moving automobile replacement parts by telephone to dealers across the country. Appellant Brisbois owned 60% and his son owned the remaining 40% of the stock of North American. Brisbois was the chief executive officer of the corporation. James Levy and David Fursetzer were partners who had some sales experience in this type of business. They were hired by Brisbois as co-sales managers of the corporation on a commission basis. Within several months, the sales of the corporation began to dramatically increase—from pre-employment annual sales of approximately $370,000 to post-employment annual sales of $2,210,000. Because they wanted security, Levy and Fursetzer sought to obtain a share of the corporation. Negotiations with Brisbois in an attempt to acquire a share in North American in the summer of 1977 failed. Later that fall, Levy and Fursetzer sought a written employment contract. Negotiations led to a 2-year employment contract between Furlev [1] and North American. Brisbois signed on behalf of North American. The contract provided Furlev was to receive $8,000 per month flat fee, 2% override on monthly sales and 40% of North American's net profits.

Within 2 months after its execution, Brisbois began to complain about the contract. He felt the contract was responsible for some cash flow problems North American was experiencing, and, on behalf of North American, he wanted to "get out of it." Soon North American fell behind in its payments to Furlev. Furlev did receive its monthly fee through May 1978, but only received the 2% override through February of that year and never received 40% of the net profits of the corporation.

Brisbois consulted his attorney, Martin M. Fiterman, about the possibility of North American terminating the contract; he offered Levy individually a percentage of North American if the contract could be terminated; he complained to other company employees about the cash flow problem and his dissatisfaction with Fursetzer and Levy's performance, and made statements that he was either going to sell North American to Furlev or "get them out of the company."

In May or June 1978, Furlev offered to renegotiate the contract. Brisbois asked his son to negotiate with Furlev and its attorney. Negotiations to revise the contract arrived at an impasse. Meanwhile, some discussions took place concerning the possibility of Furlev purchasing North American. At this stage, Brisbois advised Furlev that Fiterman would be handling negotiations concerning the purchase of North American by Furlev. Furlev was represented by its attorney, Stephen Bard. At a meeting in Bard's office on June 13, 1978, at which neither Brisbois was present, the price and terms for payment were discussed among Bard, Fursetzer, Levy and Fiterman. Furlev thought Brisbois was asking too much for the company. Fiterman reported to Brisbois that Furlev would not pay the asking price but that he, Fiterman, would.

At a meeting on June 30, 1978 in Bard's office, Furlev made a counter-offer to purchase North American that was approximately $300,000 less than Brisbois' sale offer. At that point, Fiterman rejected the offer and informed Levy and Bard that he, Fiterman, was buying North American. Fiterman then made it clear to Levy that he, Fiterman, wanted the Furlev employment contract terminated.[2] Thereupon, Levy and

1. Prior to signing the contract, Levy and Fursetzer converted their partnership to a corporation, Furlev Sales and Associates, Inc. The December 30, 1977 employment contract was between North American and the corporation, Furlev.

2. According to Levy, at that time the following conversation ensued:

Fiterman discussed the "settlement" of the contract, finally arriving at a figure of $125,000 payment to Furlev, but the settlement was not finalized because Levy wanted to talk with Fursetzer first. On July 5, 1978, Levy, Fursetzer, Bard and Fiterman met. The parties agreed on a termination payment of $125,000 to be comprised of $50,000 in cash and $75,000 in auto parts.[3] The deal could not then be "closed" because Fiterman had not completed the purchase of North American from the Brisboises, and because Fiterman was going on a 2-week vacation both "deals" would have to await his return. Meanwhile, Bard was to reduce the Fiterman-Furlev agreement to writing. Fiterman asked Levy and Fursetzer to remain on the job until he returned from vacation to which they ultimately assented. The following morning Levy and Fursetzer reported for work as usual. They reported to Brisbois that Fiterman was buying the company and that they would be leaving within 2 weeks. Brisbois wanted them to leave at once. Ultimately, Fiterman arrived and, after discussing the matter with Bard, indicated to Levy and Fursetzer that "for everybody concerned we feel it is best that you leave." Before he would leave, Levy wanted to talk with Bard. Fiterman got on the telephone and advised Bard that "we had a deal," and that Bard should not require anything in writing from Fiterman. Relying on those assurances from a fellow lawyer, Bard told his clients they could leave.[4]

When Fiterman returned from vacation, he advised Bard there would have to be changes in the termination contract that Bard had drafted.[5] At this meeting, Bard could not "pin Fiterman down" on whether or not Fiterman had completed the purchase from the Brisboises of North American.

After Fiterman had compiled a list of parts that would constitute $90,000 of the purchase price, Furlev rejected the list as unacceptable. When Bard advised Fiterman of this, Fiterman said he would "get back" to him but he did not do so. On August 7, 1978, Bard paid a surprise visit to Fiterman at North American at which time Fiterman said he was "not going to do the deal" with Brisbois. Bard tendered performance of the employment contract on behalf of his clients, but he was informed by Fiterman that the employment contract was breached when Levy and Fursetzer walked off the job on July 6, 1978. Subsequently, on September 8, 1978, Fiterman did buy Brisbois' interest in North American and Brisbois' stock certificate was signed over to Fiterman. Fiterman began borrowing money from North American. An audit by a bookkeeper hired by the Brisboises in 1979 determined that between $175,000 and $200,000 had been withdrawn from North American by Fiterman. Brisbois came back into North American in an

---

Levy: "Marty, I guess we are partners."
Fiterman: "No, I don't think that is the way it is going to be."
Levy: "Well, I have got a contract."
Fiterman: "How much money could you make if I started changing this rule and this rule and this rule and that rule?"
Levy: "I couldn't make very much. You wouldn't make very much either."
Fiterman: "I want to get you out of the contract."
Levy: "Okay."

3. Levy, Fursetzer and Bard all testified that the parties "shook hands" on the agreement. Fiterman, on the other hand, claimed the entire conversation was conditional upon his being able to acquire North American from Brisbois.

4. Bard and Fiterman had a somewhat different version of what occurred on July 6. Bard denied he ever told Levy and Fursetzer to leave.

Fiterman said Brisbois wanted them to leave "now," but Fiterman claimed he told Brisbois that he, Fiterman, would not tell them to leave because he had an agreement. Fiterman admitted that he talked to Bard, and that Bard wanted it in writing, but Fiterman claimed he told Bard that he, Bard, would have to decide what advice to give his clients. Fiterman claimed that after Bard talked with Levy both Fursetzer and Levy left. Fiterman claimed he was unhappy with their departure because he felt they still had a contract with North American.

5. The "mix" was changed to $35,000 in cash and $90,000 in auto parts. Also, Fiterman wanted to be able to designate what parts Furlev could take.

attempt to save the company, but the company eventually went bankrupt.

Furlev commenced this action (1) against North American to recover damages for breach of the December 30, 1977 employment contract; (2) against North American and Fiterman for breach of contract of the alleged July 5, 1978 "settlement contract" which purported to settle and terminate the December 30, 1977 employment contract; and (3) against Brisbois and Fiterman in tort for alleged wrongful interference with the contractual relationship between Furlev and North American.[6]

The trial court submitted a seven-interrogatory special verdict to the jury. The jury found Furlev's loss of the benefits secured by its employment contract to be $125,000. It further found that both Fiterman and Brisbois wrongfully interfered with the December 30, 1977 employment contract and that Fiterman's interference showed, on clear and convincing evidence, a willful indifference to the rights of Furlev. Finally, the jury assessed $75,000 in punitive damages against Fiterman. The court made its findings based on the special verdict and subsequently entered judgment against Brisbois and Fiterman jointly and severally for $125,000 and against Fiterman for an additional sum of $75,000.

■■ Both appellants challenge the sufficiency of the evidence to support the jury's finding of wrongful interference by Brisbois and Fiterman with the December 30, 1977 employment contract between Furlev and North American. The claim for wrongful interference with contractual relationships is a tort action. *See Royal Realty Co. v. Levin*, 244 Minn. 288, 69 N.W.2d 667 (1955). There are five elements to this tort: (1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages. The burden of proving sufficient

justification for interference is upon the defendant. *Stephenson v. Plastics Corp. of America*, 276 Minn. 400, 416, 150 N.W.2d 668, 679 (1967). The dispute here is focused on elements (3) and (4).

■ 1. An examination of the record leads us to the conclusion that appellant Brisbois did not intentionally procure the breach of the contract. Without doubt, as officer and on behalf of North American, he wanted to terminate or amend the contract which he felt to be oppressive. He consulted with several persons, including his attorney, about how he could accomplish this objective. However, Brisbois personally took part in no negotiations with Levy, Fursetzer or Bard concerning the renegotiation of the contract. When Brisbois learned in June that Furlev might be interested in purchasing North American, he advised Levy that his attorney, Fiterman, would be handling the negotiations concerning the purchase. Brisbois had authorized Fiterman to negotiate the sale of the business. He did not authorize Fiterman to renegotiate Furlev's employment contract. Had Furlev purchased North American, the issue of the employment contract would have become moot. When Fiterman decided to buy North American, he began to negotiate with Levy and Fursetzer for a "settlement" of their contract. Both Levy and Fursetzer testified they would not have left North American but for the "settlement" they made with Fiterman on July 5, 1978. In our view, there was insufficient evidence to show that Brisbois intentionally procured the breach of the contract. But even if there were evidence to support a finding of intentional interference with the contract by Brisbois, the evidence clearly showed it was with justification. Brisbois was concerned about the cash flow of North American. He attributed the company's cash flow problem to the burdens on the compa-

---

**6.** Prior to trial, bankruptcy proceedings were commenced against North American. Those proceedings operated to stay any court action against North American. Although that left remaining claim number (2) above against Fiterman and North American, it was not actual-

ly litigated and the case proceeded against appellants Brisbois and Fiterman on the third claim of wrongful interference with the contract relationship between North American and Furlev.

ny caused by Furlev's employment contract. The record clearly shows he held no personal animosity toward either Levy or Fursetzer so he did not maliciously seek to damage them. Whatever steps Brisbois took to terminate the Furlev employment contract he took on behalf of North American as an officer and principal shareholder of that corporation.

█ 2. Brisbois further claims that even if the jury could have found that he intentionally interfered with respondent's contractual relationship with North American, he was shielded from liability to personally pay damages to Furlev because at all times material he was majority shareholder and officer of North American acting in its behalf. The general rule is that officers of a corporation are shielded from personal liability for interference with contracts if they merely cause the corporation not to perform the contract. *Wilson v. McClenny*, 262 N.C. 121, 136 S.E.2d 569 (1964). *See also Terry v. Zachry*, 272 S.W.2d 157 (Tex.Civ.App.1954); *Application of Brookside Mills, Inc.*, 276 A.D. 357, 94 N.Y.S.2d 509 (1950); Annot. 26 A.L.R.2d 1227 (1952). To hold otherwise would burden corporate officers from acting in the best interests of the corporation. *Remy Beverages, Inc. v. Myer*, 56 N.Y.S.2d 828 (Sup.Ct.1945), *aff'd*, 269 A.D. 1013, 59 N.Y. S.2d 371 (1945).[7] Minnesota addressed the issue in *Space Center, Inc. v. 451 Corporation*, 298 N.W.2d 443 (Minn.1980). In that case, Space Center contended that the two shareholders of 451 Corporation should be held liable as individuals for their interference with the corporation's contract. We held that they were not subject to personal liability.[8] *See also Bouten v. Richard Miller*

*Homes, Inc.*, 321 N.W.2d 895, 900 (Minn. 1982). Even a malicious or bad faith motive of a party to a contract causing a breach does not convert a contract action into a tort action. *Wild v. Rarig*, 302 Minn. 419, 442, 234 N.W.2d 775, 790 (1975), *appeal dismissed*, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976). *See* W. Prosser, *The Law of Torts* § 129 (4th ed. 1971). There is no evidence in this record that Brisbois acted outside the scope of the best interests of North American. Accordingly, we hold that he is shielded from liability for any alleged wrongful interference with Furlev's contractual relationship with North American.

█ 3. Appellant Fiterman likewise claims that the evidence does not support the jury's finding that he wrongfully and intentionally procured the breach of the employment contract. Fiterman, an attorney at law, was retained by Brisbois on behalf of North American to negotiate the sale of North American to Furlev. He was not retained to renegotiate Furlev's employment contract. When Furlev responded to North American's proposed sale price of $435,000 by making a counter offer of $150,000 on June 30, 1978, Fiterman indicated that he, Fiterman, was buying the company. Thereafter, until August 7, 1978, the events took place as set forth in the statement of facts. Nothing appellant Fiterman did up to August 7, 1978 constituted wrongful interference with any of respondent Furlev's contractual rights. On July 15, 1978, Fiterman negotiated a settlement with Furlev whereby he would pay the latter $125,000 to terminate the contract with North American which Fiterman was contemplating buying from the Brisboises. In

---

7. At least one court has held that corporate officers are personally liable even though they were acting for the benefit of the corporation. *See Kane v. Nomad Mobile Homes, Inc.*, 105 Ill.App.2d 465, 245 N.E.2d 512 (1969) (abstract opinion).

8. In *Space Center, Inc. v. 451 Corporation*, 298 N.W.2d 443, 452 (Minn.1980), we said:

A malicious or bad-faith motive in breaching a contract does not convert a contract action into a tort action * * *. The actions of

Mueller and Dyste as individuals cannot be separated sensibly from the action of 451 Corporation so as to find that these individuals induced the corporation to breach the contract, where they are the sole owners, officers and directors of the corporation. We hold that under the facts of this case, there was no tort independent of the breach of contract claim; therefore, the trial court's disallowance of punitive damages was proper. (citation omitted)

connection with the July 5 "settlement," Fiterman was not engaged in any wrongful contractual interference as to Furlev since all parties understood Fiterman was going to buy North American.

On August 7, 1978, however, Fiterman told Furlev's attorney, Stephen Bard, that he had no intention of performing the July "settlement" agreement. At this point, Furlev could have sued Fiterman for breach of contract or perhaps for fraud and deceit. However, Furlev, at this point, could not have successfully pursued a claim for wrongful interference, an "interference" in which Furlev and its sole stockholders were willing participants. North American might well have had a claim for wrongful interference because it was that corporation which was being deprived of the services of Furlev as a result of Fiterman's conduct.

Ordinarily, the plaintiff in a wrongful interference action is a party who claims he has been deprived of the other party's performance by reason of conduct of a third person. The Restatement (Second) of Torts § 766A (1977), however, recognizes the plaintiff may also be the party who was prevented from performing. But here, plaintiff Furlev was "prevented" from performing by agreeing with a third person not to perform. It appears to us that this is not the kind of "interference" contemplated by section 766A.

However, as part of that same conversation on August 7, after Fiterman had said the settlement deal was off, Furlev, through its attorney, stated it was then ready and willing to perform its employment contract with North American and there tendered performance. There was evidence, which the jury could have found to be true, that at this point appellant Fiterman rejected the tender and induced Brisbois to concur in that rejection and that Fiterman, in rejecting the tender, was acting in his own personal interests as confirmed by his subsequent purchase of North American from Brisbois a month later.

Interference is unjustifiable when it is done for the indirect purpose of injuring the plaintiff or benefiting the defendant. *Stephenson v. Plastics Corp. of America,* 276 Minn. 400, 416, 150 N.W.2d 668, 680 (1967); *Johnson v. Gustafson,* 201 Minn. 629, 634, 277 N.W. 252, 255 (1938). Ordinarily, justification is a question for jury resolution. 45 Am.Jur.2d *Interference* § 27 (1969). Fiterman had the burden of proving justification for interference. *Bennett v. Storz Broadcasting Co.,* 270 Minn. 525, 537, 134 N.W.2d 892, 901 (1965). There was sufficient evidence in the record to support the jury's conclusion that Fiterman had failed to meet his burden of proving justification, and that his interference with Furlev's contractual relationship with North American was intentional.

4. Appellants further claim the trial court prejudicially erred in reception of evidence. Levy testified at the trial about a telephone conversation between Brisbois and Fiterman he overheard on an extension line. This conversation was on the general subject of "getting rid" of Fursetzer and Levy. Clearly, this was not error. *Katzmarek v. Weber Brokerage Co.,* 214 Minn. 580, 8 N.W.2d 822 (1943). Levy had permission to listen to incoming calls from Brisbois as part of his job, and Brisbois knew he was talking to Fiterman on one of the lines that could be monitored by Levy.

Mark Jaffee, a salesman for North American, talked with Fiterman and Brisbois on August 7, 1978. He tape recorded the conversation. At the trial he never testified but the tape was admitted in evidence. The tape recording revealed that if Levy and Fursetzer tried to show up for work, Fiterman would call the police and that Fiterman and Brisbois felt Levy and Fursetzer had breached the contract by walking out on July 6, 1978. The trial court agreed the tape had been admitted without proper foundation[9] in his order of August

---

9. There are seven foundational elements that must be established before a tape recording can

be admitted: (1) a showing that the recording device was capable of taking testimony; (2) a

24, 1981, denying post-trial motions. However, he decided the error was harmless. We agree. The conversation on the tape was merely cumulative of other testimony, and nothing was revealed that was not revealed by other evidence submitted in the case.

5. Appellant Brisbois next argues that there are eight errors in instructions the trial court gave to the jury. Since we have reversed the judgment against him, if there were errors the issues raised are now moot. In passing, however, we note that the argument with respect to the alleged errors is presented for the first time on appeal; it was not raised at trial or in the post-trial motions. Accordingly, the instructions became the law of the case. Minn.R.Civ.P. 51; *Gryc v. Dayton-Hudson Corp.,* 297 N.W.2d 727, 738–39 (Minn.1980), *cert. denied sub nom. Riegel Textile Corp. v. Gryc,* 449 U.S. 921, 101 S.Ct. 320, 66 L.Ed.2d 149 (1980).

6. Damages sustained by Furlev as a direct result of the breach of the employment contract were in dispute. It was evident that Furlev could have expected to earn approximately $380,000 if the contract had run its duration. Furlev earned approximately $240,000 operating on its own during the remainder of the contract period and so was damaged by approximately $140,000. However, since Furlev was willing to settle in the summer of 1978 for $125,000, the jury was justified in finding that to be a reasonable measure of damages. On the other hand, there was evidence that in the light of subsequent events, Furlev might not have earned that much under the contract. In sum, there was a dispute. The assessment of damages on disputed evidence is within the province of the jury. *Northern States Power Co. v. Barnard,* 187 Minn. 353, 245 N.W. 609 (1932).

7. Appellant Fiterman claims that he was at all times acting as attorney and agent for Brisbois or for North American. It seems clear from the evidence that Fiterman was never hired by Brisbois to negotiate a termination or an amendment of the Furlev employment contract. Rather, he was hired to negotiate a sale of North American to Furlev. Actions he took with respect to trying to "settle" Furlev's employment contract were beyond the scope of his agency in representing Brisbois in the sale of the company. Clearly, Brisbois would not be responsible either for compensatory or punitive damages for Fiterman's actions vis-a-vis Furlev's contract when Fiterman was not acting for or on behalf of Brisbois.

8. Finally, Fiterman claims that the court erred in admitting evidence that Fiterman borrowed substantial sums of money from North American after September 1978. He claims the reception of this evidence caused the jury to find against him on the punitive damage claim as a result of "passion and prejudice." Whether this evidence should have been admitted is to a great extent discretionary with the trial court. Minn.R.Evid. 403. The trial court concluded the evidence of these loans was relevant because it reflected on the credibility of Fiterman and upon the validity of the claim of the appellants that it was the Furlev contract which was causing North American cash flow problems. The record affirms that the trial court performed its duty in weighing relevancy as opposed to the alleged "danger of unfair prejudice." This court cannot say the trial court's decision in favor of admission was clearly erroneous.

9. Respondent Furlev contends it should be awarded attorneys fees and expenses as provided in Minn.R.Civ.P. 37 for proving facts that it sought to establish by

showing that the operator of the device was competent; (3) establishment of the authenticity and correctness of the recording; (4) a showing that changes, additions and deletions have not been made; (5) a showing of the manner of the preservation of the recording;

(6) identification of the speakers; and (7) a showing that the testimony elicited was voluntarily made without any kind of inducement. *See Edwards v. State,* 551 S.W.2d 731, 733 (Tex.Cr.App.1977).

request for admissions served upon appellants prior to the trial.[10] The trial court held that appellants Fiterman and Brisbois had "reasonable ground that they might prevail on the matter." As noted by the trial judge, "there was evidence introduced at the trial which, had it been accepted by the jury, would have enabled the jury to make findings contrary to most if not all of plaintiff's request for admissions." Examination of the lengthy record clearly supports the trial court's ruling on this issue.

We remand this case to the Hennepin County District Court for entry of judgment in favor of appellant Brisbois. We affirm the judgment against appellant Fiterman, both for compensatory and punitive damages.

COYNE, J., took no part in the consideration of this case.

---

**10.** Rule 37.03, Minnesota Rules of Civil Procedure, provides:

If a party fails to admit the genuineness of any documents or the truth of any matter as requested under Rule 36, and if the party requesting the admissions thereafter proves the genuineness of the document or the truth of any such matter, he may apply to the court for an order requiring the other party to pay him the reasonable expenses incurred

in making that proof, including reasonable attorney's fees. The court shall make the order unless it finds that (1) the request was held objectionable pursuant to Rule 36.01, or (2) the admission sought was of no substantial importance, or (3) the party failing to admit had reasonable ground to believe that he might prevail on the matter, or (4) there was other good reason for the failure to admit.