7 F.3d 704
 63 Fair Empl.Prac.Cas. (BNA) 47, 62 Empl.
Prac. Dec. P 42,567
Monroe MANESS, Appellant,
v.
STAR-KIST FOODS, INC.; H.J. Heinz Company, Inc.; Motkov,
Griffin, Parsons, Salzman & Madoff; Keith C.
Hult; James J. Salzman; Ray McCabe;
Alan D. Dierdorff; Larry
Burke, Appellees.
 No. 92-3393.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 17, 1993.
Decided Oct. 7, 1993.
Rehearing and Suggestion for Rehearing En Banc Denied Nov. 26, 1993.
 
 Patrick M. Connor, Minneapolis, MN, argued (Robert J. Brenner, on the brief), for appellant.
 Edward N. Laine, St. Paul, argued (Carol A. Ellingson, on the brief), for Star-Kist and H.J. Heinz Co.
 Kirk O. Kolbo, Minneapolis, MN, on brief for other appellees.
 Before JOHN R. GIBSON, Circuit Judge, ROSS, Senior Circuit Judge, and MORRIS SHEPPARD ARNOLD, Circuit Judge.
 JOHN R. GIBSON, Circuit Judge.
 
 
 1
 Monroe Maness appeals from a judgment entered against him on his claim against Star-Kist Foods, Inc. and H.J. Heinz Company, Inc., the parent company of Star-Kist, that he was discharged in retaliation for participating in a sexual discrimination lawsuit of another Star-Kist employee in violation of Title VII, 42 U.S.C. § 2000e-3(a) (1988), and the Minnesota Human Rights Act, Minn.Stat. § 363.03 subd. 7 (1985). He also appeals the entry of summary judgment on his claim against the law firm of Motkov, Griffin, Parsons, Salzman, and Madoff, and individual members of that law firm, who were counsel for Star-Kist in the related sexual discrimination litigation. He argues that but for his participation in protected activity, Star-Kist would not have requested a meeting with him, that Star-Kist's ignorance of its lawyer's act does not immunize it from liability, and that the lawyer's conduct is imputable to Star-Kist. He also argues that the district court erred in an earlier order in granting summary judgment on the tortious interference claim as it applies to at-will employment. We affirm the judgment of the district court.[1]
 
 
 2
 Star-Kist hired Maness in 1973 as a production superintendent in the Tuffy's division pet food plant in Perham, Minnesota. In March 1981 he encouraged and assisted a friend and co-worker, Alice Ellenberg, in filing charges of sex discrimination and discrimination in pay against Star-Kist with the Equal Opportunity Employment Commission. Maness wrote three letters to the EEOC on her behalf. He subsequently helped her draft another charge, in which she claimed that Star-Kist dismissed her in retaliation for filing the earlier charges. After Ellenberg filed suit against Star-Kist, Maness gave a statement to her lawyer, Barbara Louisell, about her work situation. Louisell listed Maness as a witness for Ellenberg's trial.
 
 
 3
 Star-Kist retained the Motkov law firm in May 1983 to represent it in the Ellenberg case. A partner of the firm, James Salzman, assigned responsibility for defense of the case to Keith Hult, an associate in the firm. In July 1983 Salzman interviewed Maness about the Ellenberg case, and during this meeting Maness gave Salzman a copy of the statement that he had previously given to Louisell. On July 29, 1984, the plant manager, Alan Dierdorff, requested that Maness meet with Hult to discuss the Ellenberg case. Dierdorff, and another Star-Kist official, Ray McCabe, attended the meeting, but did not actively participate in it. Maness told Hult that he would not voluntarily testify in the Ellenberg case. Hult never told Maness not to testify for Ellenberg. Maness later changed his mind about testifying for Ellenberg, and he was served with a subpoena to testify in her case while he was in Minnesota on a family matter. Shortly thereafter, Hult called Maness to ask him about the subpoena, and Maness refused to speak to him. Hult requested a meeting, but Maness refused.
 
 
 4
 On September 5, 1984, Hult called Maness to discuss Maness' upcoming deposition. Hult told Maness that he wanted to meet with him to discuss allegations that Maness had disclosed information to Louisell that Hult believed was covered by the attorney-client privilege. Maness refused to talk to Hult. Hult sent Maness a letter that same day insisting that they meet on September 12. Meanwhile, Maness hired a lawyer, Charles Traw. Traw called Hult and told him that Maness would not attend the September 12 meeting, and that Hult should make all further contacts through Traw. Hult told Traw that he wanted to meet with Maness, that Star-Kist's attorney-client privilege applied to Maness, and that as Star-Kist's employee Maness owed a duty of loyalty to Star-Kist. Hult sent a letter to Traw on September 14, explaining that he wanted to meet with Maness to discuss possible breaches of the attorney-client privilege. Traw did not respond to this letter.
 
 
 5
 Maness' deposition was taken on September 18, 19 and 20. Magistrate Judge Boline had ordered that the parties take Maness' deposition in his courtroom. Judge Boline ordered Maness not to answer questions objected to on the ground of attorney-client privilege, and stated that after the parties completed the deposition he would preside while Maness answered those questions with no attorneys present. Judge Boline determined that he would review the deposition transcript and excise any portions protected by the attorney-client privilege. After the deposition, Judge Boline issued an order that the attorney-client privilege had attached to certain portions of the meetings between Maness and Star-Kist's attorneys. He gave Star-Kist's attorneys a copy of the in camera deposition transcript with privileged portions excised. Both sides appealed this order to the district court.
 
 
 6
 On June 19, 1985, Hult telephoned Traw to tell him that the district court affirmed Judge Boline's order. Hult again asked to meet with Maness to discuss possible breaches of the attorney-client privilege. Traw refused to agree to a meeting between Hult and Maness, believing that a meeting was unnecessary because Hult had received the privileged portions of Maness' deposition.
 
 
 7
 On July 3, Hult telephoned Traw again requesting a meeting with Maness. Traw assured Hult that he would contact him after he met with Maness on July 10, but Traw never contacted Hult. On July 22, Hult sent another letter to Traw demanding a meeting by July 30. This letter stated that if Traw did not contact Hult by that date, Hult would assume that Maness refused to discuss the "breaches of the attorney-client privilege," and Hult would notify Tuffy's of Maness' refusal. Traw's office received the letter on July 25, but Traw had left on vacation July 19, and did not return until August 1. No one in Traw's office responded to Hult's July 22 letter or informed Maness of its contents.
 
 
 8
 On July 31, 1985, Hult reported to Heinz's general counsel and Star-Kist's personnel department of Traw's failure to respond by the July 30 deadline. Hult wrote that he had been unable to set up a meeting with Maness through Traw, and that he assumed that "[Ellenberg's] attorney has received information concerning our trial strategy and our settlement posture." Based on Hult's report of Maness' failure to meet with him, Star-Kist's Vice President, Brian Leamy, fired Maness.
 
 
 9
 On August 1, 1985, Traw returned to his office, discovered Hult's July 22 letter, and learned from Maness of his termination. Traw contacted Hult, explaining that he did not know about the July 30 deadline, and stating that if Tuffy's reinstated Maness without loss of benefit or pay, Maness would meet with Hult. Leamy refused to reinstate Maness because he believed that Maness' actions reflected an unwillingness to meet about the possible disclosure of confidential information, that Maness breached his obligation to cooperate with Star-Kist, and that Maness was using Star-Kist's desire for a meeting as a tool to gain reinstatement.
 
 
 10
 In January 1986 Maness filed charges of discrimination with the Iowa Civil Rights Commission and the Minnesota Department of Human Rights, and received a right to sue letter from the EEOC. Maness then filed suit against Star-Kist, Heinz, the Motkov law firm, Hult and Salzman, and individual Star-Kist officials, alleging violations of the Minnesota Human Rights Act, Minn.Stat. § 363.03, conspiracy in violation of 42 U.S.C. § 1985 (1988), violations of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. §§ 1961-1968 (1988), and multiple pendent state law claims. Star-Kist, Heinz and the Motkov law firm filed a motion for summary judgment, and the district court[2] dismissed all of Maness' claims, except the claims of retaliation in violation of Title VII and the Minnesota Human Rights Act. Maness v. Star-Kist Foods, Inc., No. 6-87-523, slip. op. at 22 (D.Minn. Jan. 2, 1991). Maness appeals the dismissal of his tortious interference with contract claim.[3]
 
 
 11
 After a nine-day bench trial, the district court entered judgment for all defendants on Maness' retaliation claims. Maness v. Star-Kist Foods, Inc., No. 6-87-523, slip op. at 21, 1992 WL 541251 (D.Minn. Sept. 11, 1992). Using the Texas Department of Community Affairs v. Burdine, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981), analysis,[4] the district court found: (1) that Maness made a prima facie case of retaliatory discharge or reprisal for his protected acts under both Title VII and the Minnesota Human Rights Act, (2) that Star-Kist had established a legitimate and non-discriminatory reason for firing Maness, specifically, the failure to meet with Hult, and (3) that Maness failed to establish pretext. The court concluded that neither Star-Kist, nor its officials, McCabe, Dierdorff and Burke, participated in any intentional or otherwise actionable reprisal or other discrimination against Maness in violation of Title VII or the Minnesota Human Rights Act. Maness, slip op. at 20-21. Finally, the court found that the Motkov firm, Hult and Salzman, did not aid or abet any reprisal in violation of the Minnesota Human Rights Act. Maness appeals the district court's finding of a non-retaliatory reason for his discharge and the dismissal of the tortious interference claim.
 
 I.
 
 12
 Maness first argues that the district court erred in dismissing his retaliation claims. He contends that the district court's findings that Star-Kist had a legitimate, non-discriminatory reason for his discharge, and no retaliatory intent, were clearly erroneous. He specifically attacks the district court's finding that his protected participation in the Ellenberg case was independent of Star-Kist's requests to discuss attorney-client communications arising from that lawsuit. The shortcoming of Maness' argument is that after a full trial on the issue of retaliation, the three-part Burdine analysis falls from the case, and the district court must only determine the ultimate issue: whether the employer retaliated against the employee for exercising his protected rights. United States Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711, 714-15, 103 S.Ct. 1478, 1481-82, 75 L.Ed.2d 403 (1983). The Supreme Court recently affirmed this position in St. Mary's Honor Center v. Hicks, --- U.S. ----, ----, 113 S.Ct. 2742, 2753, 125 L.Ed.2d 407 (1993), holding that once an employer articulates a non-discriminatory purpose for termination, the three-part analysis drops from the case, and the district court must only decide whether the employer intentionally discriminated or retaliated against the employee. As the thrust of the discussion of both parties relating to prima facie case, non-discriminatory reasons and pretext are immaterial at this stage, we consider these arguments only insofar as they may illuminate the general question of whether retaliation or discrimination has been established. See Aikens, 460 U.S. at 716, 103 S.Ct. at 1482 (ultimate issue of discrimination or retaliation is decided by considering all of the evidence of record); St. Mary's Honor Center, --- U.S. at ----, 113 S.Ct. at 2748 (same).
 
 
 13
 The district court made an unequivocal finding that Star-Kist did not retaliate or discriminate against Maness, and that Maness was fired because he failed to meet with Star-Kist attorneys. Maness, slip op. at 33 (Sept. 11, 1992). These are factual findings that we may reverse only if clearly erroneous. Fed.R.Civ.P. 52; St. Mary's Honor Center, --- U.S. at ----, 113 S.Ct. at 2756 (citing Anderson v. City of Bessemer City, 470 U.S. 564, 573-76, 105 S.Ct. 1504, 1511-13, 84 L.Ed.2d 518 (1985)). When findings of fact are based on credibility of witnesses, great deference is given to the trial court's determinations. Davis v. Lambert of Arkansas, Inc., 781 F.2d 658, 660 (8th Cir.1986). If an employer proves that its reason for terminating an employee was independent of the employee's exercise of protected rights, the termination will be deemed non-retaliatory. Benson v. Little Rock Hilton Inn, 742 F.2d 414, 418 (8th Cir.1984). Even if the protected conduct is a substantial element in the decision to terminate the employee, the employer will not be liable if the employee would have been discharged in the absence of the protected activity. Womack v. Munson, 619 F.2d 1292, 1297 (8th Cir.1980), cert. denied, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981).
 
 
 14
 Maness relies on Womack, where this court held that an employer unlawfully terminated an employee for expressing personal opinions about another lawsuit. There, the court concluded that Womack's discharge was "inextricably linked" to his protected rights in the underlying case, and thus retaliatory in nature. Womack, 619 F.2d at 1297. Maness' dismissal differs significantly from the Womack case. Here, the trial court specifically concluded that Maness was fired because he refused to meet with Star-Kist attorneys, despite their many requests. The district court found that he was dismissed for refusing to discuss the extent to which he disclosed potentially privileged information to Louisell, not for expressing his personal views of Ellenberg's case. The district court's ruling that the reason for Maness' termination was sufficiently independent of the underlying Ellenberg case was not clearly erroneous.
 
 
 15
 Maness also argues that Star-Kist's failure to reinstate him proves retaliation. The district court rejected this contention, ruling that Leamy's decision was legitimately based on Hult's August 15 letter, which never mentioned the Ellenberg case except insofar as it involved Maness' possible breaches of Star-Kist's attorney-client privilege. Leamy testified that he believed Maness' refusal to meet for almost a year reflected an unwillingness to cooperate, which the trial court determined was a legitimate reason for termination. The district court was in the best position to judge the credibility of the witnesses in this case, and we will not upset its conclusion that Maness' refusal to meet and cooperate with his employer was the cause of his termination, not his involvement in Ellenberg's litigation. See, e.g., Davis, 781 F.2d at 660 (evidence was sufficient to support a finding that employer's refusal to reconsider employment was not retaliatory); Benson, 742 F.2d at 418 (sufficient evidence supported trial court's finding that employer discharged employee for lying and stealing, reasons independent of her allegations in her discrimination suit against the employer). Thus, the district court's finding is not clearly erroneous.
 
 II.
 
 16
 Maness also appeals the district court's order granting summary judgment against him on his claim for tortious interference with his employment contract. Maness contends that Hult tortiously interfered with his employment and thereby caused his termination. The district court dismissed the claim, concluding that because Maness was an at-will employee, no employment contract existed and, accordingly, he was precluded from recovering for any intentional interference with contractual relations. Maness v. Star-Kist Foods, Inc., No. 6-87-523, slip op. at 22 n. 16 (D.Minn. Dec. 31, 1990).
 
 
 17
 Subsequent to the district court's dismissal of Maness' claim, the Minnesota Supreme Court has concluded that a tortious interference claim may arise from an at-will employment agreement. See Nordling v. Northern States Power Co., 478 N.W.2d 498, 505 (Minn.1991). Notwithstanding this development in the law, we still uphold the district court's dismissal of Maness' tortious interference claim based on other grounds. See Lane v. Peterson, 899 F.2d 737, 742 (8th Cir.), cert. denied, 498 U.S. 823, 111 S.Ct. 74, 112 L.Ed.2d 48 (1990) ("[W]e may affirm a judgment on any ground supported by the record even if not relied upon by the district court.").
 
 
 18
 In Minnesota, the plaintiff in a tortious interference with contract action must prove: (1) the existence of a contract; (2) the alleged wrongdoer had knowledge of the contract; (3) an intentional procurement of a breach; (4) the alleged wrongdoer acted without justification; and (5) damages. Furlev Sales and Assocs. v. North Am. Automotive Warehouse, Inc., 325 N.W.2d 20, 25 (Minn.1982). Regardless of whether a contract existed, Maness offered no evidence that Hult intended to cause Maness' termination or that he did cause it, and therefore, the district court did not err in granting summary judgment. Hult's only role in Maness' termination was that of informing Leamy of Maness' refusal to meet. The district court concluded, and the correspondence between Hult and Leamy shows, that Hult never recommended that Leamy fire Maness.
 
 
 19
 In addition, and independent of Maness' failure to establish the required elements of a claim of intentional interference with contract, an attorney who acts within the scope of the attorney-client relationship will not be liable to third persons for actions arising out of his professional relationship unless the attorney exceeds the scope of his employment or acts for personal gain. McDonald v. Stewart, 182 N.W.2d 437, 440 (Minn.1970); Schuler v. Meschke, 435 N.W.2d 156, 163-64 (Minn.Ct.App.1989). Furthermore, in Minnesota, a corporation's officer, employee, or agent who acts with a good-faith belief that his actions are furthering the company's business is legally justified in interfering with another employee's employment contract. Nordling, 498 N.W.2d at 507. This defense is lost only when the agent acts with bad faith, personal ill-will, malice, or a deliberate intent to harm the employee. Id. The record reflects no evidence that Hult acted for personal gain or with ill-will toward Maness.[5] The district court did not err in entering summary judgment against Maness on his tortious interference with contract claim.
 
 
 20
 We affirm the judgment of the district court.
 
 
 
 [1]
 The Honorable Richard H. Kyle, United States District Judge for the District of Minnesota
 
 
 [2]
 The Honorable Diana E. Murphy, Chief Judge, United States District Court for the District of Minnesota
 
 
 [3]
 The district court dismissed Maness' claims of conspiracy under 42 U.S.C. § 1985, and RICO, 18 U.S.C. §§ 1961-1968, as well as claims of intentional infliction of emotional distress, extortion, wrongful discharge in violation of public policy, defamation, and breach of an implied covenant of good faith and fair dealing. Maness does not appeal the dismissal of these claims
 
 
 [4]
 Under the Burdine three-part analysis, once a plaintiff makes a prima facie showing of retaliation, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the dismissal. If the employee produced evidence other than retaliation, then plaintiff must show that the employer's proffered reason was actually a pretext for retaliation. Burdine, 450 U.S. at 253, 256, 101 S.Ct. at 1094, 1095; McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-05, 93 S.Ct. 1817, 1824-26, 36 L.Ed.2d 668 (1972); Womack v. Munson, 619 F.2d 1292, 1296 (8th Cir.1980)
 
 
 [5]
 We need not discuss the degree to which the attorneys' conduct created substantial legal difficulties in this litigation