Mark **HARMAN**, Respondent,

v.

**HEARTLAND FOOD COMPANY,** et al., **Appellants.**

No. C5–99–1805.

Court of Appeals of Minnesota.

July 18, 2000.

J. Brian O'Leary, O'Leary and Moritz, Chartered, Springfield, for respondent.

James H. Malecki, Mark S. Ullery, Gislason & Hunter, L.L.P., Mankato, for appellants.

Considered and decided by DAVIES, Presiding Judge, PETERSON, Judge, and HALBROOKS, Judge.

## OPINION

DAVIES, Judge.

After a jury trial, appellants Heartland Food Company and Tim Johnson were found liable on respondent Mark Harman's claims for defamation and wrongful interference with a contractual relationship.

They challenge the trial court's denial of their motion for JNOV. Appellants argue that (1) Johnson's statement about Harman's skills was non-actionable and (2) any interference with Harman's employment relationship was justified by Heartland Food's right to protect its own legitimate business interests. We agree and reverse.

## FACTS

### The Interference With Contract Claim

In 1989, Harvest Land entered into a seven-year contract to produce turkeys for Swift–Eckrich, Inc., a turkey processor. The contract required Swift–Eckrich to pay medication expenses incurred by Harvest Land in growing the turkeys; it also gave Swift–Eckrich authority to oversee Harvest Land's turkey operations. Respondent Mark Harman managed Harvest Land's turkey production division.

In the spring of 1992, Swift–Eckrich assigned its interest in the Harvest Land contract to Heartland Food (appellant). Appellant played a more active role in overseeing Harvest Land's turkey growing operation than had Swift–Eckrich, sending a service person to inspect the barns regularly and making recommendations on technical matters. Appellant's president testified that proper and efficient flock management by the grower is important to the processor's profitability and that appellant was losing money on its contract with Harvest Land. Due to differing flock-management philosophies, tensions developed between appellant's personnel and Harman.

The most significant dispute concerned medication and vaccination. Johnson, appellant's procurement director, testified that Harman refused to follow appellant's medication and vaccination programs and failed to obtain appellant's consent before administering medications. Johnson testified that Harman tended to use medication for every problem that came along, even though medication is not always an appropriate solution. Harman admitted that on occasion he administered medication despite appellant's refusal to approve and that he stopped following appellant's vaccination program because he felt it was not working.

Johnson testified that appellant's personnel met with Harman and his staff several times to try to resolve the medication issues. Johnson also met with Harvest Land's general manager and assistant general manager several times to explain appellant's frustration with the way Harman was managing Harvest Land's farms.

In November 1994, Johnson sent written guidelines for medicating and vaccinating turkeys to Harvest Land. But Harman concedes that he did not comply with these guidelines because he did not believe the contract gave appellant the authority to enforce them. Harman continued to medicate turkeys without appellant's approval and also failed to comply with a vaccination requirement in the guidelines.

Johnson testified that appellant continued to incur substantial losses on Harvest Land's flocks and that he believed those losses were partially attributable to Harman's medication and vaccination policies. A discussion with Harman in June or July of 1996 left Johnson with the impression that Harman would continue not to cooperate with appellant's policies.

A month or two later, appellant sent Harvest Land a message proposing—or requiring—that Harman not be involved in turkey raising for appellant, its parent, or two other affiliated companies. Allegedly, as a result of appellant's request—or demand—Harman was transferred from Harvest Land's turkey division to a non-management position in an affiliated company. As a result of the transfer, Harman's salary was reduced from $52,000 per year to $36,000 per year and he no longer was involved with turkey production, his specialty.

### The Defamation Claim

Harman's defamation claim is based on a statement appellant Johnson made to

Dale Tauer, who also had a contract to grow turkeys for appellant Heartland Food Company. Johnson told Tauer that "Harman knew nothing about raising turkeys" and that if Tauer did not stay away from Harman, Tauer's contract with Heartland would be in jeopardy. Tauer testified that he did not take the statement seriously, but as simply a comment arising from Johnson's anger at that time. Tauer testified that he knew Harman was an experienced and competent turkey grower who he occasionally asked for advice on medication issues.

## ISSUES

I. Did the trial court err in denying appellants' motion for JNOV on Harman's defamation claim?

II. Did the trial court err in denying appellants' motion for JNOV on Harman's claim for intentional interference with a contractual relationship?

## ANALYSIS

■ When the trial court considers a motion for JNOV it must determine whether, viewing the evidence in the light most favorable to the nonmoving party, the verdict is manifestly against the entire evidence or whether despite the jury's findings of fact the moving party is entitled to judgment as a matter of law. Therefore the standard of review is de novo. Where JNOV has been denied by the trial court, on appellate review the trial court must be affirmed, if, in the record, there is any competent evidence reasonably tending to sustain the verdict. Unless the evidence is practically conclusive against the verdict, this court will not set the verdict aside. The evidence must be considered in the light most favorable to the pre-

vailing party and an appellate court must not set the verdict aside if it can be sustained on any reasonable theory of the evidence.

*Pouliot v. Fitzsimmons,* 582 N.W.2d 221, 224 (Minn.1998) (quotations and citations omitted).

### I.

■ To be defamatory, a statement must be communicated to someone other than the plaintiff, must be false, and must tend to harm plaintiff's reputation in the community. *Stuempges v. Parke, Davis & Co.,* 297 N.W.2d 252, 255 (Minn.1980).[1] Words may be divided into three categories: (1) those that cannot possibly have a defamatory meaning; (2) those that are reasonably susceptible to a defamatory meaning; and (3) those that are clearly defamatory on their face. *Church of Scientology of Minn. v. Minnesota State Med. Ass'n Found.,* 264 N.W.2d 152, 155 (Minn.1978). The question of whether a claimed defamatory meaning is reasonably conveyed by the language used is a question of law for the court. *Utecht v. Shopko Dep't Store,* 324 N.W.2d 652, 653 (Minn. 1982).

■ Whether a defamatory meaning is conveyed is dependent upon how an ordinary person understands "the language used in the light of surrounding circumstances." *Gadach v. Benton County Co-op. Ass'n,* 236 Minn. 507, 510, 53 N.W.2d 230, 232 (1952). In deciding whether words bear a non-actionable meaning, the words "must be construed as a whole without taking any word or phrase out of context, or placing undue emphasis upon any one part." *Morey v. Barnes,* 212 Minn. 153, 156, 2 N.W.2d 829, 831 (1942). Some persons, in a forced attempt at colorful expression, indulge in ill-advised

1. Because the speech at issue involved a private plaintiff and a private issue, we analyze this issue under principles of Minnesota common law. We do not believe that the First Amendment provides any protection to appellants in this private defamation action. *See* *Weissman v. Sri Lanka Curry House, Inc.,* 469 N.W.2d 471, 472–73 (Minn.App.1991) ("constitutional safeguards for public persons and public issues have not been extended to private plaintiff/private issue defamation actions").

use of inaccurate terminology; and an article written in that manner may or may not be libelous, depending on the occasion and circumstances and how it is understood by those reading it.

*Id.* (holding jury must decide whether use of word "brothel" to describe plaintiff's home is defamatory in light of context of article). "Epithets or adjectives can constitute defamation if they imply a specific type of reprehensible conduct." *Weissman,* 469 N.W.2d at 473; *see, e.g., Uhlman v. Farm, Stock & Home Co.,* 126 Minn. 239, 241, 148 N.W. 102, 102 (1914) (describing plaintiffs as a "precious bunch of crooks" and "as straight as a rail fence and as honest as Ananias" was libelous).

 Applying these principles, we hold that, as a matter of law, Johnson's statement to Tauer that "Harman knew nothing about raising turkeys" did not have an actionable defamatory meaning in the context in which it was uttered. Both Johnson and Tauer knew that Harman had extensive experience in turkey growing. Tauer testified that he knew that Harman was a competent turkey grower and did not believe Johnson's statement was intended to provide information about his competence. Tauer explained that Johnson was angry when he made the statement. Given the context, including Johnson and Tauer's knowledge of Harman's experience, the statement could not reasonably have been interpreted as defamatory. It was, therefore, mere rhetorical hyperbole and non-actionable.[2,3]

## II.

 The elements of a cause of action for wrongful interference with a contractual relationship are:

(1) the existence of a contract; (2) the alleged wrongdoer's knowledge of the

contract; (3) intentional procurement of its breach; (4) without justification; and (5) damages.

*Kjesbo v. Ricks,* 517 N.W.2d 585, 588 (Minn.1994) (quoting *Furlev Sales and Assoc. v. North American Automotive Warehouse, Inc.,* 325 N.W.2d 20, 25 (Minn. 1982)). The issue in this case relates to the fourth element, justification.

 The policy underlying the tort of wrongful interference with a contractual relationship is to protect "the expectations of contracting parties against frustration by *outsiders who have no legitimate social or economic interest in the contractual relationship.*" *Kasparian v. County of Los Angeles,* 38 Cal.App.4th 242, 262, 45 Cal.Rptr.2d 90, 100 (Cal.Ct.App.1995) (emphasis added).

An action for interference with contract does not lie where the alleged interferer has a legitimate interest, economic or otherwise, in the contract or expectancy sought to be protected and employs no improper means.

\* \* \* \*

For purposes of this tort, improper means are those that are independently wrongful such as threats, violence, trespass, defamation, misrepresentation of fact, restraint of trade or any other wrongful act recognized by statute or the common law. Moreover, the improper means must be a part of what procures the breach.

*Birdsong v. Bydalek,* 953 S.W.2d 103, 112–13 (Mo.Ct.App.1997) (quotations and citations omitted).

 Appellant had a legitimate economic interest in the profitability of its contract with Harvest Land. Harman argues, however, that appellant's interfer-

---

**2.** We also note that there was no showing of damage arising from Johnson's statement to Tower.

**3.** Appellants argue that Johnson's statement to Tauer that "Harman knew nothing about raising turkeys" cannot support a defamation

claim because it was protected opinion. The argument is attractive, but our review of Minnesota common law does not support such a fact/opinion distinction in a private plaintiff case. *See Weissman,* 469 N.W.2d at 473.

ence with his employment relationship with Harvest Land was motivated by malice towards him, not by economic concerns. But even if there is a degree of malice, when a defendant has a legitimate economic interest to protect, a plaintiff must show that the breach of plaintiff's contract with the third party resulted at least in part from the defendant's commission of an independent tort or other illegality. *See id.* at 113 (improper means are acts recognized by statute or common law as wrongful); *Kerr Constr. Paving Co., Inc. v. Khazin,* 961 S.W.2d 75, 80–81 (Mo.Ct.App. 1997) (independently actionable conduct constitutes improper means); *see also Texas Beef Cattle Co. v. Green,* 921 S.W.2d 203, 211 (Tex.1996) ("[i]mproper motives cannot transform lawful actions into actionable torts"; when a party has a legal right to act, it may do so with impunity, regardless of motive).

Defamation was the only independent illegality alleged. But Harman's defamation claim, based on a statement to Tauer, fails as a matter of law. The statement is also causally unrelated to the interference claim. His wrongful interference claim fails.

Finally, Harman argues that appellant's demand that Harman not be involved with raising turkeys for appellant did not occur until after the contract between Harvest Land and appellant had been renewed. Harman claims appellant, therefore, had no legitimate interest to protect when it interfered with Harman's employment relationship with Harvest Land. But whether the interference occurred before or after the contract had been renewed is irrelevant, for even if the contract had already been renewed, appellant had a right to police Harvest Land's performance during the renewal period. And, absent a response to its complaints about Harman's implementation of that performance, appellant could have opted to terminate the contract for unsatisfactory performance and have had its dispute with Harvest Land—and Harman—resolved in a breach-of-contract action.

Having determined that Harman, as a matter of law, failed to establish a claim for wrongful interference with a contractual relationship, we do not reach the issue of whether the trial court erred in instructing the jury on justification.

## DECISION

The trial court erred in denying appellants' motion for JNOV on Harman's claims of defamation and wrongful interference with a contract.

**Reversed.**