John E. PETROSKEY, Plaintiff,

v.

LOMMEN, NELSON, COLE & STAGEBERG, P.A., a professional corporation, Phillip A. Cole, an individual, Defendants.

Civ. No. 3–92–543.

United States District Court, D. Minnesota, Third Division.

Feb. 1, 1994.

Robert J. Brenner, Brenner & Associates, Minneapolis, MN, for plaintiffs.

Lynn G. Truesdell, III, Bassford, Heckt, Lockhart, Truesdell & Briggs, Minneapolis, MN, for defendants.

## ORDER

KYLE, District Judge.

Before the Court is plaintiff John E. Petroskey's Objections (Doc. No. 47) to the January 5, 1994 Report and Recommendation of United States Magistrate Judge Raymond L. Erickson (Doc. No. 45). In the Report and Recommendation, Magistrate Judge Erickson recommends granting the Defendants' Motion for Summary Judgment.

A district court must make an independent determination of those portions of a Report and Recommendation to which objection is made and may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1)(C).

Based upon an independent review of the files, records, and proceedings herein, including those portions of the Report and Recommendation to which Petroskey has filed Objections, the Report and Recommendation is **ACCEPTED** in its entirety and **IT IS ORDERED** that the Defendants' Motion for Summary Judgment (Doc. No. 19) is **GRANTED.**

## ORDER and REPORT AND RECOMMENDATION

ERICKSON, United States Magistrate Judge.

At Duluth, in the District of Minnesota, this 5th day of January, 1994.

### I. *Introduction*

This matter came before the undersigned United States Magistrate Judge pursuant to a special assignment, made in accordance with the provisions of Title 28 U.S.C.

§ 636(b)(1)(B), upon the Defendants' Motion [1] for Summary Judgment.

A Hearing on the Motion was held on December 14, 1993, at which time the Plaintiff appeared by Robert J. Brenner, Esq., and the Defendants appeared by Lynn G. Truesdell, Esq.

For reasons which follow, we recommend that the Defendants' Motion for Summary Judgment be granted.

## II. *Factual and Procedural Background*

On February 1, 1987, John E. Petroskey ("Petroskey") was hired by the law firm of Lommen, Nelson, Cole & Stageberg, P.A. ("Lommen–Nelson") to serve as an Office Manager. In that capacity, Petroskey was engaged as an employee-at-will, who had no contract, implied or express, which governed the terms and conditions of his employment at Lommen–Nelson, nor has he claimed that he had received any promise of permanent employment at the firm.

At the time of his hire, the principal shareholders in Lommen–Nelson were John Lommen, Owen Nelson, the Defendant Phillip A. Cole ("Cole"), and Roger and Mark Stageberg. In Petroskey's estimation, from the outset his relationship with each of the principal shareholders was "great," with the notable exception of Cole. As described by Petroskey, Cole "would give directives, give orders, and you were expected to obey and follow." It was Petroskey's observation that his exchanges with Cole were strained throughout his stay at the firm and, in a particularly graphic depiction, Petroskey described Cole's demeanor toward him in the following terms:

[H]e was screaming so loud, he was out of control, breathing heavily, spitting, red faced, swearing at the top of his lungs, smashing his fist into the desk, and whenever I tried to say something, he said shut up in a very loud voice, screaming, do not talk back to me, you listen to what I say, you do exactly ·as I say without saying another word. Do you understand? I said yes. I never said another word.

The focus of Cole's verbal rebuke was not restricted to Petroskey as, in Petroskey's opinion, a number of attorneys had left Lommen–Nelson because of Cole's treatment and, in Petroskey's view, the morale among the lawyers and staff suffered because of Cole's general demeanor.

Although recognizing Cole as "intolerant of behavior that he consider[ed] substandard," as "demanding," and as being unpleasant toward Petroskey, members of the firm regarded Cole as a "rainmaker," as a "perfectionist," and as one who liked "good performance" and who expected "things to move at a rapid pace." Without contradiction in this record, Cole had engaged in negativism and in personal attacks against various employees of the firm, including Petroskey. Nonetheless, in terms of his professional contributions to the firm, the following characterization of Cole also stands uncontroverted:

Phil Cole is a major contributor of business. Phil Cole is a [sic] probably one of the most respected trial lawyers in the State of Minnesota. He enhances the reputation of the firm. He's a major contributor to the management and operation of the firm. If he left, he would probably

---

1. In addition to their Motion for Summary Judgment, the Defendants Lommen, Nelson, Cole & Stageberg, P.A., ("Lommen–Nelson") and Phillip A. Cole ("Cole"), filed a Motion to extend the cut off date for the scheduling of a Hearing on dispositive Motions, and an informal Motion to strike, as untimely, the materials that the Plaintiff had submitted in response to the Summary Judgment Motion. The Plaintiff has not opposed the Motion to Extend, and that Motion is granted.

We deny the Defendants' Motion to Strike, however, as moot. Initially, the Motion for Summary Judgment was to be heard on November 16, 1993, before the United States District Court, the Honorable Richard H. Kyle presiding, but the Hearing date was continued because of the District Court's referral Order of October 26, 1993. As a result, any delay in the Plaintiff's submission of papers, in opposition to the Motion for Summary Judgment, was inconsequential.

Lastly, as we note in the text of this Opinion, the Plaintiff voluntarily dismissed his claims against the Defendants Jeff D. Prouty, individually and formerly d/b/a The Prouty Project n/k/a The Prouty Project, Inc., a Minnesota Corporation. By Order dated November 18, 1993, the District Court dismissed those claims with prejudice and, accordingly, the Summary Judgment Motion of those Defendants is no longer before us, and the caption of the case has been modified to reflect that fact.

take a number of other lawyers and staff people with him.

According to the same appraisal, if Cole were to leave Lommen–Nelson, "[i]t would have a substantial adverse impact [on] the firm." Whatever else may be said of Cole's acerbic and acrimonious criticism of Petroskey,[2] even Petroskey has acknowledged that the criticism was an expression of Cole's frustration over his perception of Petroskey's job performance, or that of an employee over whom Petroskey had responsibility.

In August of 1989, Lommen–Nelson merged with the Smith–Juster law firm, causing an immediate need to intermesh attorneys, office staff, computer equipment, and billing and accounting systems, as well as an abrupt demand for increased office space. In the estimation of Lommen–Nelson, Petroskey was unable to sustain the increased burdens imposed by the merger process. Petroskey denies any such inability and correctly notes that his personnel file is devoid of any adverse commentary on his job performance. Although acknowledging the substantial criticism that had been expressed by Cole and by Ronald L. Haskvitz,[3] who was another senior shareholder in the firm and a social friend of Cole, Petroskey felt that the quality of his work was consistent with his annual increases in salary and his yearly receipt of bonuses.

In contrast to Petroskey's appraisal of his work performance, the management of Lommen–Nelson has characterized him as "[r]ude, abrasive and insulting to personnel," and as an "obstructionist" who steadfastly resisted changes in the firm's operations and equipment. While the record reflects that, prior to his termination, Petroskey was never told that "he was in danger of losing his job," there is also an abundance of evidence that the attorneys, secretaries and the clients of the firm had voiced objections concerning Petroskey's management style, and his capabilities.

In March of 1991, three shareholders left the firm in order to form their own practice—for reasons which are contested. Petroskey avows that the attorneys had informed him that they could not endure Cole's criticisms further, while the management of Lommen–Nelson recounts that the parting shareholders have denied that Cole was the catalyst for their departure. In any event, the management of the firm and, most particularly, Leonard Juster ("Juster")—the firm's President—sought the assistance of a consultant who could evaluate the strengths and weaknesses of the firm, and who would make recommendations for improvement. In reliance upon the recommendations of other law firms, Juster retained Jeff Prouty ("Prouty") to undertake the consultancy.

Over the ensuing months, Prouty conducted a series of interviews with the attorneys and with certain of the staff members of Lommen–Nelson, including Petroskey. As reflected in the following colloquy, Petroskey attributed the problems at the firm solely to the presence of Cole:

Q. What did you tell [Prouty]?

A. I told him first of all that the problems with low morale and low productivity were the ones that we had all talked about with Leonard, with the other partners. It was Phil Cole. Phil Cole was the problem with the firm.

Q. From your point of view?

A. I told him that Phil Cole was the problem with the firm.

\* \* \* \* \* \*

Q. Did you tell him anything else?

A. He asked me what I thought the solution to the problem would be, and I told him the solution would be what most people I talked to about the problem thought

---

**2.** As a particularly demeaning example, Petroskey has testified that Cole "liked to say fucking stupid" to him, although Petroskey could not recall whether those words were directed at an idea or at the person discussing an idea. According to Petroskey, while he remembered very little about his meetings with Cole, he did remember "the words, the swearing, and the ridicule."

**3.** The record reflects that Haskvitz accused Petroskey, on at least one occasion, of not telling the truth. In turn, Petroskey contends that, like Cole, Haskvitz was identified by Leonard Juster ("Juster"), who was the President of Lommen–Nelson, as one of the lawyers whose termination would benefit the firm.

it would be. It would be solved if Phil Cole left the firm.

\* \* \* \* \* \*

Q. Did you bring up other solutions?

A. No, I didn't.

Q. Your solution was Phil leaves the firm, right?

A. Yes.

Similar criticism of Cole had been expressed by Petroskey in the past. In March of 1991, Cole had submitted a resignation letter—which was later withdrawn—and, at that time, Petroskey advised Juster that he would take a 10 percent cut in pay if the firm were to terminate Cole, and it was Petroskey's surmise that there were many other people "who would do the same."

In June of 1991, after Prouty's interview with Petroskey and following a weekend retreat that he had conducted for the law firm, Prouty issued a brief report which included the following recommendation:

YOUR ADMINISTRATIVE HELP..... If it was my firm, I'd hire an administrator with "management experience in a professional services firm" to be a key player in marketing, finance, human resource, technology, and general management issues.

Subsequently, Juster continued his consultation with Prouty in order to help the firm "work through [its] current management issues," and he requested Prouty to make recommendations "for an assignment of responsibilities for various management functions so we can go forward with our primary business as lawyers, not administrators." Prouty conducted additional interviews with the Lommen–Nelson lawyers and, in a report that was telefaxed to Juster on October 6, 1991, he made the following recommendation:

HIRE A TALENTED FIRM ADMINIS-TRATOR—Far too much lawyer time is being spent on administrative issues. Many of the issues that you raised in the interviews dealt with computers, paralegals, messenger service, office assignments, marketing—issues that could (and should) be handled by an administrator. I interviewed Jack prior to our June retreat. His capabilities are limited and it's clear he is not enjoying his work. I rec-ommend you give Jack a fair severance package, assist him in finding a new job, and begin the process of hiring an administrator with strong managerial and business skills.

I recommend you look for someone in the $60–80,000 salary range who has managed in a professional services firm environment. The dollars invested in salary and benefits will be returned through increased lawyer billable hours IF YOU (AS SHAREHOLDERS) WILL LET GO OF THE DAY–TO–DAY MANAGEMENT ISSUES and delegate the resolution of those issues to your administrator.

Additionally, Prouty made recommendations concerning Cole's involvement as the Vice–President of the firm:

ELIMINATE THE VICE–PRESIDENT ROLE—Many of the issues raised in my discussions centered around Phil's involvement (or perceived involvement) in management issues. Across the board, people feel Phil has "good ideas/poor implementation."

The shareholders feel strongly that Phil should be on the board. He is viewed as a visionary and a catalyst for change. Having dealt with Phil, I believe he is a very bright individual with good business sense.

My recommendation is that Phil become a section chief. I don't believe the section chiefs need a coordinator. If it becomes apparent that they do, I suggest Lenny play that role as President of the firm. I have a number of professional service firms that do not have vice-presidents. I believe your firm will be more effective with less hierarchy. It was also suggested that the vice-president role be filled by someone other than Phil. Again, I would encourage you to eliminate the position altogether.

On October 9, 1991, the firm's Board of Directors convened in order to discuss and act upon the recommendations of Prouty. Following a general discussion, the Prouty recommendations were unanimously adopted in their entirety. On the same date, Juster advised Petroskey that his employment with the firm was being terminated but that the

firm was desirous of retaining his services through the close of the calendar year in order that various year-end financial reports could be completed. Consistent with Prouty's recommendation, a number of the firm members provided highly complimentary letters of recommendation to Petroskey, others offered to assist him in his job search, and Petroskey continued to work with the firm until January 14, 1992, at which time he received a three-month severance payment.

Petroskey contends that Prouty was expressly hired because the firm "needed help in dealing with Phil Cole" and with the low morale in the firm which Cole engendered. According to Petroskey, Roger Stageberg told him privately that "Prouty wrote what Phil Cole told him to write" but, upon further questioning, Petroskey acknowledged that his opinion in this respect was "pure speculation." Petroskey also testified that Juster advised him, privately, that "Phil Cole told them that if they didn't fire [Petroskey], then Phil Cole would leave the firm," and that Petroskey was made the "scapegoat for Phil Cole."[4] Although recognizing that the decision to terminate him was unanimously made by the firm's Board of Directors, Petroskey believed that the Board "knuckled under to Cole" because "they didn't want Phil Cole to leave" the firm.[5] In this sense, Petroskey recognized that the Board made a business decision in selecting Cole to remain with the firm.

In addition to the foregoing, Petroskey has isolated three events as the predicate acts which underlie his "whistleblower" or retaliatory discharge claim. The first of these incidents involved a heated exchange between Cole and a female paralegal—who was pregnant at the time—which had been brought to Petroskey's attention.[6] In turn, Petroskey advised Juster as follows:

> I told Leonard that we've put up with Phil for years and I said this time it is differ-

ent, it is dangerous, and he could have caused a serious medical problem and I said we have got to do something about it. We've got to get him to a doctor, do something to keep him from doing this to people.

Nothing further about this incident is presented in this record.

The second circumstance occurred shortly after the first. As related by Petroskey, Cole had been retained to represent the Chestnut & Brooks law firm and a retainer, in the amount of $25,000, was escrowed in a trust account for the payment, on an incremental basis, of Cole's fees and expenses. Apparently, Cole had expressed a growing concern to Petroskey that too much time was elapsing before his fees and expenses were drawn from the Chestnut & Brooks trust account and deposited in Lommen–Nelson's operating accounts. As related by Petroskey, Cole's solution to the laggardly payment problem was to authorize non-lawyers to execute the withdrawals from the trust account funds. According to the firm's standard procedure, the signatures of two attorneys was necessary before withdrawals from a trust account would be authorized. Following his exchange with Cole and the receipt of a memorandum from Cole which purportedly reiterated the same solution, Petroskey brought the matter to Juster's attention. In response to Petroskey's statement that he was not going to follow Cole's solution, Juster said "don't," "[f]orget it," and "I will talk to Phil." As long as Petroskey worked at Lommen–Nelson, Cole's solution of having non-lawyers authorize payment from a trust account was never implemented.

The last of the three incidents related to the entitlement of Henry Feikema ("Feikema") to "full disability" payments under the firm's insurance policy. Feikema is a senior partner and trial attorney at Lommen–Nel-

---

**4.** Petroskey also testified that, as early as 1990, Juster had advised him that Juster and Roger Stageberg "would try to protect [him] because Phil was out to get [him]."

**5.** Juster testified that, to his knowledge, at no time did Cole approach the other shareholders and threaten to leave the firm if the Plaintiff was not dismissed. Nonetheless, Juster was well

aware that Cole and Petroskey had a significant conflict in personalities.

**6.** Although Petroskey testified that this incident occurred in July or August of 1990, the context of this testimony suggests that his dating of the occurrence was a misstatement, and that the episode transpired in July or August of 1991.

son. Apparently as a result of contracting cancer, Feikema was suffering from incontinence. While not aware of the precise nature of Feikema's disability, or of the pertinent provisions of the firm's disability insurance policy, Petroskey overheard an expression of concern, during the course of a Board of Directors' meeting, that Feikema's disability payments were contingent upon his not trying lawsuits and yet Feikema was reported to be making Court appearances. Thereafter, when Petroskey received a request for information from the firm's disability insurer, he reported to Juster that he was "not going to have anymore to do with this." The basis for this refusal is disclosed in the following exchange:

Q. Why did you do that?

A. Because I didn't want to be involved.

Q. Why was that?

A. Because it sounded like something that they shouldn't be doing.

\* \* \* \* \* \*

Q. And you had one conversation with Leonard about this or more than one?

A. Just one.

Q. And what did you say and what did he say?

A. After I told him that I didn't want anything more to do with it, he said that's all right, you can bring all those to me.

Petroskey had no information as to the function Feikema was serving in "going to Court"—whether he was trying cases, arguing Motions or attending conferences—nor did he know if any of these forms of making a Court appearance would be inconsistent with Feikema's full disability claim.

Based upon these circumstances, Petroskey commenced this action against Lommen–Nelson, Cole, Prouty, and Prouty's successive corporate identities. As to the Prouty interests, claims premised upon breach of contract/promissory estoppel, defamation, compelled self-publication of defamatory information and the negligent infliction of emotional distress were alleged. The actions asserted against Lommen–Nelson and Cole included claims of: a retaliatory discharge in violation of Minnesota Statutes Section 181.931; negligent retention and supervision; an intentional infliction of emotional distress; a tortious interference with an employment relationship; and, age discrimination under the Minnesota Human Rights Act, Minnesota Statutes Section 363.01 *et seq.*, and under the Age Discrimination in Employment Act of 1967, as amended, Title 29 U.S.C. § 621 *et seq.*

█ Following the completion of discovery, Petroskey voluntarily dismissed all of his claims against the Prouty interests and all of his actions against Lommen–Nelson and Cole, with the exception of his contention that Lommen–Nelson was guilty of a retaliatory discharge that was precipitated by Petroskey's "whistleblowing" activities, and his assertion that Cole had wrongfully interfered with Petroskey's employment relationship with the firm. By Order dated November 18, 1993, the United States District Court, the Honorable Richard H. Kyle presiding, dismissed with prejudice the causes of action that Petroskey had voluntarily withdrawn. Accordingly, we need only address Petroskey's retaliatory discharge and his wrongful interference claims.[7]

---

7. Originally, this action was commenced in the Minnesota District Court for the Fourth Judicial District, and was removed to this Court, at the instance of the Defendants, because of Petroskey's claim that the Defendants' conduct violated the Age Discrimination in Employment Act of 1967, as amended, Title 29 U.S.C. § 621 et seq., and the Fair Labor Standards Act, Title 29 U.S.C. § 216 et seq. Although the Federal question jurisdiction, which was imbued by these statutes, has been eviscerated by the District Court's Order of November 18, 1993, none of the parties has questioned our continued jurisdiction over the subject matter of Petroskey's action, nor has any of the parties sought a remand to the State Courts. Nonetheless, we briefly review our supplemental jurisdiction to consider Petroskey's claims.

Under the Judicial Improvements Act of 1990, Title 28 U.S.C. § 1367(a), the Federal Courts "shall have supplemental jurisdiction" over claims which are "part of the same case or controversy" as a claim over which the Court has exercised its original jurisdiction. Section 1367(c), however, vests the Court with wide discretion to decline to exercise jurisdiction if "the district court has dismissed all claims over which it has original jurisdiction." In exercising that discretion, the Court "should consider and weigh in each case, and at every stage of the litigation," the factors of "judicial economy, convenience,

## III. *Discussion*

 A. *Standard of Review.* Summary Judgment is neither an acceptable means of resolving triable issues, nor is it a disfavored procedural shortcut when there are no issues which require the unique proficiencies of a Jury to weigh the evidence and to render credibility determinations. *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2554, 91 L.Ed.2d 265 (1986). A Summary Judgment is warranted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Rule 56, Federal Rules of Civil Procedure.* For these purposes, a disputed fact is "material" if it must inevitably be resolved and the resolution will determine the outcome of the case, while a dispute is "genuine" if the evidence is such that a reasonable Jury could return a verdict for the non-moving party. See, *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) ("An issue of material fact is genuine if it has a real basis in the record.").

As Rule 56(e) makes clear, once the moving party presents a properly supported Motion, the burden shifts to the non-moving party to demonstrate the existence of a genuine dispute. While the Court views the evidence in favor of the nonmoving party and gives that party the benefit of every justifiable inference that may be drawn from that evidence, "an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but * * * must set forth *specific facts* showing that there is a genuine issue for trial." *Rule 56(e),* [emphasis supplied]; *Honeywell, Inc. v. United States,* 973 F.2d 638, 641 (8th Cir.1992), citing *Ivan Spencer v. Kroger Company,* 941 F.2d 699 (8th Cir.1991); *Lomar Wholesale Grocery, Inc. v. Dieter's Gourmet Foods, Inc.,* 824 F.2d 582, 585 (8th Cir.1987), cert. denied, 484 U.S. 1010, 108 S.Ct. 707, 98 L.Ed.2d 658 (1988); *Johnson v. Robbinsdale Independent School Dist. No. 281,* 827 F.Supp. 1439, 1441 (D.Minn.1993). The nonmoving party may not rest upon the mere denials or allegations of its pleadings, nor may it simply argue that operative facts will be subsequently developed which will support its claim. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* supra, 475 U.S. at 586, 106 S.Ct. at 1355 ("[O]pponent must do more than simply show there is some metaphysical doubt as to the material facts."); see, generally, S. Childress, *A New Era for Summary Judgments: Recent Shifts at the Supreme Court,* 116 F.R.D. 183, 188 (1987).

 Moreover, a party is entitled to Summary Judgment where its opponent has failed "to establish the existence of an element essential to [its] case, and on which [it] will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* supra, 477 U.S. at 322, 106 S.Ct. at 2552. In such a case, no genuine issue of material fact will be found to exist because "a complete failure of proof concerning an essential element of [that party's] case necessarily renders all other facts immateri-

fairness and comity." *Carnegie–Mellon University v. Cohill,* 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988); see also David D. Siegel, *Practice Commentary,* appended to Title 28 U.S.C. § 1367 ("Whether a dismissal of the touchstone claim should bring about a dismissal * * * of the dependent claim for want of supplemental jurisdiction should hinge on the moment within the litigation when the dismissal of the touchstone claim takes place and on the other surrounding circumstances. * * * [I]f the dismissal of the main claim occurs late in the action, * * * knocking [the dependent claim] down with a belated rejection of supplement jurisdiction may not be fair.").

Here, Petroskey's claims are scheduled to be tried this month, all discovery is at a conclusion, and the interests of "judicial economy, convenience and fairness to the litigants" militate in favor of exercising the Court's supplemental jurisdiction. *Growth Horizons, Inc. v. Delaware County, Pennsylvania,* 983 F.2d 1277, 1284–85 (3d Cir.1993); *Kelly v. Mercoid Corporation,* 776 F.Supp. 1246, 1256 (N.D.Ill.1991). Moreover, the State law issues are neither "novel" nor "complex," such as would favor an invocation of the abstention doctrine. See, *Title 28 U.S.C. § 1367(c)(1); Railroad Commission of Texas v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941). Accordingly, in view of the special circumstances of this case, we believe that the interests of justice are best served by the deployment of the Court's supplemental jurisdiction.

al." *Id.* at 323, 106 S.Ct. at 2552. "In determining whether a material factual dispute exists, the court views the evidence through the prism of the controlling legal standard." *Nebraska v. Wyoming,* —— U.S. ——, ——, 113 S.Ct. 1689, 1694, 123 L.Ed.2d 317 (1993). If reasonable minds could differ as to the import of the evidence, however, Summary Judgment should not be granted and, in exercising its function, the Court is not to weigh the evidence. *Anderson v. Liberty Lobby, Inc.,* supra, 477 U.S. at 250–51, 106 S.Ct. at 2511; *AgriStor Leasing v. Farrow,* 826 F.2d 732, 734 (8th Cir.1987).

B. *Legal Analysis.* With these precepts in mind, we examine each of Petroskey's remaining causes of action.

1. *The Whistleblower Claims.* As we have related in some detail, Petroskey has argued that his discharge at Lommen–Nelson was retaliatory, since he had "blown the whistle" on various activities at the firm which he, in good faith, regarded as having been illegal. As a consequence, Petroskey contends that he is entitled to the protections created by the Minnesota Whistleblower Statute, Minnesota Statutes Section 181.931 *et seq.,* and to the recovery of compensatory damages. We disagree.

a. *Standard of Review.* Minnesota Statutes Section 181.932 provides, in part, as follows:

An employer shall not discharge, discipline, threaten, otherwise discriminate against, or penalize an employee regarding the employee's compensation, terms, conditions, location, or privileges of employment because:

(a) the employee * * *, in good faith, reports a violation or a suspected violation of any federal or state law or rule adopted pursuant to law to an employer or to any governmental body or law enforcement official.

\*　　\*　　\*　　\*　　\*　　\*

(c) the employee refuses an employer's order to perform an action that the employee has an objective basis in fact to believe violates any state or federal law or rule or regulation adopted pursuant to law, and the employee informs the

employer that the order is being refused for that reason.

Although the Plaintiff's pleadings and Motion papers have not expressly identified whether Petroskey's reliance has been placed upon one or both of the subparagraphs of Section 181.931, during the course of argument, counsel for the Plaintiff suggested that Petroskey's claim is premised upon the more generalized provisions of Subparagraph (a). Notwithstanding this suggestion, we have examined Petroskey's claims under each of the separately stated standards contained in Subdivision 1 of Section 181.932.

We note that, when initially enacted, Section 181.932 merely required that an employee have a "good faith" belief that a violation of the law was at hand, or suspected, before he blew the whistle or before he refused an order to perform an illegal act. In 1988, however, the Minnesota Legislature amended Subdivision 1(c) so as to require that, before an employee should refuse an order to perform an act, he should have an "objective basis in fact" to believe that the order violated the law. See, *Laws of Minnesota, Chapt. 659, Section 2, Subdivision 1(c) (1988).* As a consequence, Subdivision 1(c) appears to have a somewhat more restrictive standard than Subdivision 1(a) by requiring an objective, factual basis for believing that the employer's direction would violate a law, and in obligating the employee to advise the employer of the reasons for his refusal to obey the direction. Cf., James H. Kaster and Bradley C. Warner, "A Good Employee Is Hard To Find," *The Hennepin Lawyer* at 22 (September–October, 1988) (The standard of Subdivision 1(c) "is much greater than for the whistleblower, who needs only a good faith belief of a violation and need not inform the employer of the reasons for his actions.").

■ Under Minnesota law, the proof of a retaliatory discharge claim is subject to the meandering burdens of production dictated by *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). *Phipps v. Clark Oil & Refining Corp.,* 408 N.W.2d 569, 571–72 (Minn.1987); cf., *Graham v. Special School Dist. No. 1,* 472 N.W.2d 114, 119 n. 7 (Minn.1991); *Snesrud v. Instant Web, Inc.,* 484 N.W.2d 423,

427–28 (Minn.App.1992), pet. for rev. denied (Minn. June 17, 1992). As recently reiterated by the Court in *McGrath v. TCF Bank Savings, FSB*, 502 N.W.2d 801, 807 (Minn. App.1993):

> The McDonnell Douglas analysis requires the plaintiff in a whistleblower case to establish a prima facie case that his discharge was motivated by an impermissible reason. * * * The burden of production then shifts to the employer to articulate another permissible reason for the discharge. * * * If the employer offers such a reason, the factfinder must then determine whether the employer's proffered reason is pretextual. * * * To recover under the whistleblower statute, the employee must demonstrate that the employer's proffered reason for discharge is pretextual.

[Citations omitted]; and see, *Parten v. Consolidated Freightways Corp.*, 923 F.2d 580, 584 (8th Cir.1991); cf., Gerald T. Laurie and Andrew E. Tanick, "Whistle While You Work," *The Hennepin Lawyer* at p. 5 (September–October, 1991).

In making a *prima facie* showing, however, the Plaintiff must demonstrate that the public interest clearly mandates that protection be extended to the whistleblower. Where the internal management problems of a business are alone involved, or where the public interest is only "marginally affected," a cognizable retaliatory discharge claim will not lie. *Vonch v. Carlson Companies, Inc.*, 439 N.W.2d 406, 408 (Minn.App.1989), pet. for rev. denied (Minn. July 12, 1989).

■ b. *Legal Analysis.* In our judgment, the Plaintiff's whistleblower claims fail for want of a violation of law. While we have no qualms in concluding that a breach of a Professional Code provision, a sexually abu-

sive derision of a female co-worker, or the submission of a fraudulent insurance claim could appropriately frame a whistleblower claim, the unmistakable reality of this case is that no such violation, or suspected violation, has been shown to have occurred.[8] Accordingly, we are compelled to find that the Plaintiff has failed to demonstrate the essential elements of a *prima facie* whistleblower claim as to each of the three incidents that he has raised for our review.

With respect to Cole's berating of a female paralegal, we can accept that the conduct was distasteful and ill-advised, but that does not render the conduct illegal. See, *Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 504 (Minn.1991) (recognizing that the conduct of surveillance as to company employees "seems distasteful and may be ill-advised," but not illegal and, therefore, not an appropriate basis for a whistleblower claim), citing *Corum v. Farm Credit Services*, 628 F.Supp. 707, 719 (D.Minn.1986). Without more in the way of a substantive violation of the law, this aspect of Petroskey's claim constitutes no more than an internal dispute over matters of office and personnel management. As such, the claim is without merit.[9] *Vonch v. Carlson Companies, Inc.*, supra at 408.

We also find Petroskey's concern over Cole's recommendations for the administration of the firm's trust accounts to be misplaced. Apart from Petroskey's recognition of the impossibility that Cole's suggestion for the handling of those accounts could be effectuated—given the requirement that attorneys alone could sign the withdrawal drafts—the plain fact of the matter is that Cole's procedure was never implemented. The mere fact that, theoretically, an employer may contemplate action which, if consummated, could be contrary to public policy is

---

**8.** As we must, we assume—without deciding—that Petroskey's description of each of the three incidents is entirely accurate. *Packett v. Stenberg*, 969 F.2d 721, 724 (8th Cir.1992); *Froholm v. Cox*, 934 F.2d 959, 961 (8th Cir.1991); *Appletree Square 1 Ltd. v. W.R. Grace & Co.*, 815 F.Supp. 1266, 1270 (D.Minn.1993) ("[E]vidence of non-moving party is to be believed and all justifiable inferences are to be drawn in a light most favorable to that party."). We expressly make clear, however, that our role in considering Summary Judgment Motions is not to resolve

factual disputes and, accordingly, we leave undecided whether the rendition of the facts by one party or the other is the more believable.

**9.** We underscore that Petroskey has made no showing that any of the paralegal's statutory or common law rights were trammeled or that Cole's conduct, in any other way, was illegal. All that the record discloses is that Cole acted in a way that Petroskey thought to be objectionable.

insufficient, under the governing law, to invoke the protections of the Whistleblower Statute. See, *Nordling v. Northern States Power Co.*, supra at 504 (affirming an award of Summary Judgment, under Subdivision 1(a) of Section 181.932, where the plaintiff was "unable to identify any federal or state law or rule that was violated or suspected of being violated."); *Michaelson v. Minnesota Mining & Mfg. Co.*, 474 N.W.2d 174, 180 (Minn.App.1991) (affirming an award of Summary Judgment, under Subdivision 1(a) of Section 181.932, where the plaintiff offered no proof of a violation except for the plaintiff's "opinion that [the employer's] plans may have violated Title VII and EEO laws."), aff'd, 479 N.W.2d 58 (Minn.1992) (mem.). Were the mere musings of a discharged employee sufficient to activate the remedial measures of the Whistleblower Statute, the Minnesota Legislature would not have conditioned such relief upon a "good faith" report of a violation or suspected violation of State or Federal law. Notably, the statutory language speaks to conduct which has already transpired, and the fact that an avenue of action has been contemplated by the employer and rejected insulates that conduct from the whistleblower proscriptions. *Id.*

The same may be said of Feikema's claim under the firm's disability insurance policy. Whatever may be said of Petroskey's apprehension that the claim was unsubstantiated, he has omitted from his proffered proof any appreciable showing that Feikema, the firm or anyone else had contravened the terms and conditions of the disability policy, much less the insurance fraud prohibitions of the State and Federal laws. Petroskey's admission that he was unfamiliar with the pertinent terms of the firm's disability policy, that he was not aware of the basis for Feikema's claimed disability, and that he did not know the purposes of Feikema's Court appearances, or whether the nature of an appearance could have an impact on Feikema's disability claim, all undercut the validity of his claim. The fact that Petroskey's basis for suspecting that a violation had occurred was because "it sounded like something that they shouldn't be doing," amply belies any legitimate contention that, in good faith, Petroskey believed a violation of the law had been committed. More importantly, there is no showing in this record—despite all of the discovery to date—that anyone, including the firm's disability insurer, has questioned or invalidated Feikema's claim.

■ Our conclusion, that Petroskey's retaliatory discharge claim is without merit, remains unchanged irrespective of any reliance that he might place upon Subdivision 1(c) of Section 181.932. Even prior to its amendment in 1988, Subdivision 1(c) required more of a plaintiff than a conjectural belief that a violation of law had occurred. In *Piekarski v. Home Owners Savings Bank*, 956 F.2d 1484, 1492 (8th Cir.1992), cert. denied, —— U.S. ——, 113 S.Ct. 206, 121 L.Ed.2d 147 (1992), the Court rejected a plaintiff's argument that, so long as he had a good faith belief that his employer wanted him to commit perjury, he had a viable Subdivision 1(c) whistleblower claim. The Court concluded that the employer must have actually wanted the employee to commit perjury, and the employee's belief was irrelevant to that determination. We note that the Court's analysis, in this respect, predated the Minnesota Legislature's incorporation of the "objective basis in fact" criterion in Subdivision 1(c). Given the record before us, we find no objective basis in fact to underlie the Plaintiff's theorization that Cole's exchange with the paralegal, that Cole's proposal for the administration of the firm's trust accounts, or that the firm's handling of Feikema's disability claim were in violation of State or Federal law.

Accordingly, we recommend that Summary Judgment be awarded to the Defendants on Petroskey's whistleblower claims.[10]

---

10. We also have substantial doubt that Petroskey's description of the three events to Juster would constitute a "report" as contemplated by Section 181.932. Petroskey's function as the firm's Office Manager would necessarily entail his recounting, to the firm's management, the full gamut of his personnel and administrative concerns. Here, the record is devoid of any evidentiary showing that Petroskey reported any violation of law to Juster as a result of the three incidents he has detailed, nor has Petroskey shown, by affidavit or otherwise, that he informed Lommen–Nelson that he was refusing

2. *The Intentional Interference Claim.* As his sole remaining claim against Cole, Petroskey contends that his employment relationship with Lommen–Nelson was wrongfully terminated because of Cole's improper interference. We find the claim to be without merit, as a matter of law.

■ a. *Standard of Review.* To prevail on a tortious interference with a contract claim, the Plaintiff must prove the existence of a contract, the alleged wrongdoer's knowledge of the contract, his intentional procurement of its breach, without justification, which results in damage to the Plaintiff. *Maness v. Star–Kist Foods, Inc.,* 7 F.3d 704, 709 (8th Cir.1993), citing *Furlev Sales and Assocs. v. North American Automotive Warehouse, Inc.,* 325 N.W.2d 20, 25 (Minn. 1982); *International Travel Arrangers v. NWA, Inc.,* 723 F.Supp. 141, 154 (D.Minn. 1989, rev'd. on other grounds, 991 F.2d 1389 (8th Cir.1993); *Sports and Travel Marketing v. Chicago Cutlery,* 811 F.Supp. 1372, 1382 (D.Minn.1993); *Bouten v. Richard Miller Homes, Inc.,* 321 N.W.2d 895, 900 (Minn. 1982); *Royal Realty Co. v. Levin,* 244 Minn. 288, 69 N.W.2d 667, 671 (1955). In *Nordling v. Northern States Power Co.,* supra at 505, the Minnesota Supreme Court concluded that a "tortious interference claim will lie for an at-will employment agreement," because such an employment relationship subsists on the will of the employer and the employee, and is not dependent upon the condonation of a "third party meddler."

■ A party, however, may not interfere with its own contract. *Bouten v. Richard Miller Homes, Inc.,* supra at 901. As the Minnesota Supreme Court has explained:

> If a corporation's officer or agent acting pursuant to his company duties terminates or causes to be terminated an employee, the actions are those of the corporation; the employee's dispute is with the company employer for breach of contract, not the agent individually for a tort. To allow the officer or agent to be sued and to be personally liable would chill corporate personnel from performing their duties and would be contrary to the limited liability accorded incorporation.

*Nordling v. Northern States Power Co.,* supra at 505–06. The *Nordling* Court continued, however, by noting that, in *Bouten,* it had recognized that a corporate officer or agent might be liable for "tortious contract

---

any job assignment expressly because that assignment violated State or Federal law.

Similarly, although we need not reach the issue, we regard the causative connection between Petroskey's involvement in any of the three incidents to be tenuous, at best, with his discharge. Petroskey's termination was explicitly recommended by Prouty for reasons which were entirely unrelated to any of the three incidents. Indeed, Petroskey's testimony amply reflects his view that, at least insofar as Cole was concerned, Petroskey's continued employment at Lommen–Nelson was in jeopardy from the date of his hire. Notably, Petroskey offers no showing, however suggestive, that his termination was influenced—let alone driven—by his discussion of the three incidents with the firm's management. Cf., *Michaelson v. Minnesota Mining & Mfg. Co.,* 474 N.W.2d 174, 180 (Minn.App.1991), aff'd, 479 N.W.2d 58 (Minn.1992) (mem.).

In this respect, we find the Plaintiff's reliance upon the unpublished decision of the Minnesota Court of Appeals in *Graham v. Special School District No. 1,* 1992 WL 174719 (Minn.App. 1992), pet. for rev. denied, (Minn. September 29, 1992), to be misplaced. Upon the record in *Graham,* the Court concluded that the plaintiff had "made out a prima facie case by establishing * * * that she had engaged in statutorily protect-

ed activity in making complaints to the Department of Education * * *." Here, no such statutorily protected activity has been shown, and we are uncertain of the analysis upon which the *Graham* Court concluded, in reliance upon *Hubbard v. United Press International,* 330 N.W.2d 428, 445–46 (Minn.1983), that the plaintiff there had established a "presumptive causal connection by virtue of the timing of her discharge." Since we need not resolve the issue, we only note that the 2–day period between the protected activity and the plaintiff's discharge in *Hubbard,* as compared to the months of employment that transpired between Petroskey's assertedly protective activity and his effective termination date, do not create the same presumptive inference of retaliation that the Court voiced and, ultimately, rejected in *Hubbard.* Given Prouty's initial recommendation for Petroskey's replacement by a more experienced administrator some six months before the effective date of Petroskey's termination, there is no apparent basis to conclude that Petroskey was terminated by a retaliatory impulse. *Hubbard v. United Press International,* supra at 446. In this respect, we note that a similar hiatus in the proximity of events was sufficient in *Bouten v. Richard Miller Homes, Inc.,* 321 N.W.2d 895, 901 (Minn.1982), for the Court to conclude that the events were so remote as to be irrelevant.

interference if he or she acts outside the scope of his or her duties." *Id.*

In determining whether a corporate officer or agent was acting outside the scope of his corporate duties, the *Nordling* Court considered "motive or malice" to be a potentially critical factor, but concluded that such "malice" must be "actual malice." The Court went on to further explain:

> To put the matter another way, we conclude that a company officer, agent or employee is privileged to interfere with or cause a breach of another employee's employment contract with the company, if that person acts in good faith, whether competently or not, believing that his actions are in furtherance of the company's business. This privilege may be lost, however, if the defendant's actions are predominantly motivated by malice and bad faith, this is, by personal ill-will, spite, hostility, or a deliberate intent to harm the plaintiff employee. *Id.* at 507.

In the final analysis, in order to constitute "actual malice," such as would support an actionable claim for contractual interference, the motivation underlying the interference must be sufficiently improper so as to permit the affected employee to maintain a claim against the employer for wrongful discharge. *Piekarski v. Home Owners Savings Bank,* supra at 1496. Otherwise, the employment-at-will doctrine would be effectively obliterated by creating a tort, where no action in contract could legitimately lie. *Id.; Bloom v. Hennepin County,* 783 F.Supp. 418, 444 (D.Minn.1992); cf., *Space Center, Inc. v. 451 Corp.,* 298 N.W.2d 443, 452 (Minn.1980) (no tort independent of a breach of contract claim where actions of individuals, alleged to be maliciously motivated, could not be "separated sensibly" from the actions of the corporation of which they were owners, officers and directors); *Furlev Sales & Assocs. v. North American Automotive,* supra (corporate officer shielded from liability for any alleged wrongful interference with an employee's contract with that corporation).

b. *Legal Analysis.* Our analysis commences with a recognition that, inescapably, the workplace is a variegated skein of personalities, temperaments and idiosyncra-cies. With seeming inevitability, the commingling of such an array of human chemistries portends toward conflict, as aspirations or self-esteem, which are held with good intention, go crosswise. In apparent recognition of these naturally relentless forces, the laws of Minnesota have purposefully left unactionable conduct in the workplace which would unduly circumscribe personal interaction. Under the venerable doctrine of employment-at-will, the Minnesota Courts have long held that "an employee is free to leave the job at any time," and "[a]n employer, in turn, may terminate an employee for any reason, or no reason at all." *Miller v. Certainteed Corp.,* 971 F.2d 167, 172 (8th Cir. 1992), citing *Cederstrand v. Lutheran Brotherhood,* 263 Minn. 520, 117 N.W.2d 213, 221 (1962), and *Corum v. Farm Credit Service,* supra at 712. Under the governing law, therefore, an actionable claim will not lie for a discharge in the workplace, that is precipitated by conduct that is impolitic, boorish or intemperate, so long as that conduct is not wrongful—that is, so long as the conduct does not breach a contractual agreement, implied or express; a clearly manifested public policy; or a constitutionally or statutorily protected right.

Here, in apparent recognition that no cause of action would lie under the Minnesota law of contracts, the Plaintiff seeks to vindicate his discharge under the law of torts. Given the facts of this case, we find no basis to hold Cole liable, under the doctrine of tortious interference, for any damages that Petroskey purports to have sustained by virtue of the termination of his employment at Lommen–Nelson. At most, Petroskey has produced evidence that Cole was intemperate, inconsiderate, overbearing, coarse—in a word, tyrannical. Accepting Petroskey's description as an accurate portrayal, the conduct is, unquestionably, as unfortunate as it is unpleasant. Notwithstanding our reproach for such conduct, we find no evidence in this record that the relationship between Petroskey and Cole involved more than a personality conflict. Each thought the other's relationship with the firm should have been terminated for the betterment of the firm. Nevertheless, the record is devoid of

any showing that either harbored an intent to personally cause harm to the other. Nor, as pertinent to Petroskey's claim, does the record so much as intimate that Cole was engaged in any conduct which fell outside of the legitimate scope of his role as the Vice-President, as a Director or as a shareholder of Lommen–Nelson.

In this respect, our analysis is closely guided by the Court of Appeals' holding in *Piekarski v. Home Owners Savings Bank*,[11] supra, where the Court was squarely confronted with a personality conflict, not unlike that presented here, between a corporate official and an employee-at-will. In holding that such a conflict did not rise to the level of "actual malice," the Court reasoned as follows:

> Although the personality conflict between Piekarski and Donley also could have prompted the termination, we find that this motive does not rise to the level of actual malice unless the reason for the personality conflict would give the employee a claim against the employer for wrongful discharge. To hold otherwise would severely limit the doctrine of employment at will. Minnesota has long held that, with limited exceptions, an employer can discharge an at-will employee for any reason or no reason. * * * The exceptions pro-

hibit an employer from discharging an employee in certain circumstances or for certain reasons. There is no exception to the employment-at-will doctrine that prohibits Piekarski from firing Donley [12] because of a personality conflict stemming from Piekarski's tendency to criticize and disagree with Donley.

*Id.* at 1496.

Apart from quarreling with the Court's reasoning, the Plaintiff does not offer any meaningful basis to distinguish the applicability of *Piekarski* to the circumstances surrounding Petroskey's claim, and we find *Piekarski* to be apposite.

We are persuaded that the Plaintiff's effort to extend the tort law so as to fill the voids, that the Courts have purposefully left in the at-will doctrine, is ill-fated, given the facts of this case. On each occasion that the Minnesota Supreme Court has considered the liability exposure of a corporate owner, such as Cole, for a claimed tortious interference with a contract that has been entered by his corporation, the Court has rejected a finding of liability. See, *Space Center, Inc. v. 451 Corp.*, supra at 452; *Furlev Sales & Assocs. v. North American Automotive*, supra at 26;[13] *Bouten v. Richard Miller Homes, Inc.*, supra at 901. Moreover, our conclusion—that no action in tort may properly lie here—

---

11. Given its unique procedural history, we find the Court of Appeals' reasoning and holding in *Piekarski* to be particularly persuasive. See, *Piekarski v. Home Owners Savings Bank*, 759 F.Supp. 542 (D.Minn.1991); *Piekarski v. Home Owners Savings Bank*, 752 F.Supp. 1451 (D.Minn.1990) and particularly Appendix A at 1458.

12. We are uncertain if the Court's reference to the firing of Donley by Piekarski is a misstatement, or an intended highlighting of the reciprocal nature of employment-at-will rights. As the facts of the case make unmistakably clear, Piekarski was fired by Donley and not *vice versa*. Accordingly, we might well read this reference to stress the Court's intent to preserve the mutual freedoms which the employment-at-will doctrine extends to employers and employees alike. As the law would not imply a right on Donley's part to sue Piekarski, because Piekarski voluntarily terminated his employment relationship with Donley's corporation due to their personality conflict, the converse—it would appear—should also hold true.

13. We find the Court's explication of its holding in *Furlev Sales & Assocs. v. North American Auto-*

*motive*, 325 N.W.2d 20, 26 (Minn.1982), to be particularly instructive:

> The general rule is that officers of a corporation are shielded from personal liability for interference with contracts if they merely cause the corporation not to perform the contract. * * * To hold otherwise would burden corporate officers from acting in the best interests of the corporation. * * * Minnesota addressed the issue in *Space Center, Inc. v. 451 Corporation*, 298 N.W.2d 443 (Minn.1980). In that case, Space Center contended that the two shareholders of 451 Corporation should be held liable as individuals for their interference with the corporation's contract. We held that they were not subject to personal liability. * * * Even a malicious or bad faith motive of a party to a contract causing a breach does not convert a contract action into a tort action. * * * There is no evidence that Brisbois acted outside the scope of the best interests of North American. Accordingly we hold that he is shielded from liability for any alleged wrongful interference with Furlev's contractual relationship with North American.

is corroborated by the Minnesota Courts' resolute denouncement of the doctrine of good faith and fair dealing. *Orthomet, Inc. v. A.B. Medical, Inc.*, 990 F.2d 387, 392 (8th Cir.1993), citing *International Travel Arrangers v. NWA, Inc.*, supra, and *Wild v. Rarig*, 302 Minn. 419, 234 N.W.2d 775, 790 (1978), cert. denied, 424 U.S. 902 (1976); cf., Deborah A. Schmedemann, "Working Backwards; The Covenant of Good Faith and Fair Dealing in Employment Law," *16 Wm. Mitchell L. Rev. 1119* (1990). If an alleged breach of an implied covenant of good faith would not, under the laws of Minnesota, provide the Plaintiff with a viable cause of action, independent of a related breach of contract, we conclude that the conduct of Cole, which is alleged here and which we find to fall short of "actual malice," can not be actionable.

In sum, we share the stated concern of the Court of Appeals in *Piekarski*, that any recognition of an action in tort, premised upon a personality dispute, would result, inexorably, in subjecting every employer's decision to terminate an at-will employee to the after-the-fact, "second guess," review of a Court or Jury. *Piekarski v. Home Owners Savings Bank*, supra at 1496.[14] If such an abrupt and massive reworking of the governing law were imperative, we think its formulation, through the public debate of the legislative forum, would be the preferable means for its origin.

We, therefore, recommend that the Defendants' Motion for Summary Judgment be granted as to Petroskey's claim against Cole for an intentional interference with Petroskey's employment relationship with Lommen–Nelson.

NOW, THEREFORE, It is—

ORDERED:

1. That the Defendants' Motion for the extension of the cut off date for the scheduling of a Hearing on dispositive Motions [Docket No. 19] is GRANTED.

2. That the Defendants' informal Motion for an Order striking the Plaintiff's responsive papers as untimely [Docket No. 37] is DENIED.

AND, It is—

RECOMMENDED:

That the Defendants' Motion for Summary Judgment [Clerk Docket # 19] be granted.

---

14. We note that the Court in *Nordling v. Northern States Power Co.*, 478 N.W.2d 498, 506 (Minn. 1991), premised its analysis on a balancing of "a discharged employee's need for a remedy against the concern not to chill company personnel in the performance of their duties * * *." If the subjective impression of a discharged employee that his termination was motivated by bad faith, without more in the way of an evidentiary showing, were sufficient to create a jury issue as to the propriety of his discharge and as to his right to a recovery of damages in tort, then there would be no employer interests to balance with that avenue for remedial relief. Needless to say, we find no precedent to support such a right to recovery under the tort laws of Minnesota. To the extent that it may be claimed that *Nordling* creates such precedence, we disagree for, in *Nordling*, the Court found that the discharged employee's action against his supervisor was cognizable only because the supervisor had committed acts which the Court determined were outside of the scope of his employment. Here, we have no such showing.